**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NOS. 1:CR-10-183 |
| | ) | and 1:CR-11-003 |
| v. | ) | (Judge Rambo) |
| | ) | |
| DAVID RICHARD DODD, II | ) | |
| | ) | ELECTRONICALLY FILED |

**DEFENDANT'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**DEFENDANT'S PROPOSED FINDINGS OF FACT**

I.      **Background**

    A.      **The Cameron Street Project**

        1.      This case concerns the construction of a $24,000,000.00 office building and complex known as the Cameron Street Project ("Project"), its complex combination of federal, state, city, and private financing, and the Defendant's attempt to oversee the Project's construction.

        2.      The Project did not begin with the concept of the Defendant being the construction manager. During the Project's construction, the Owner, Cameron Real Estate LP's ("CRE") president, Defendant, David Richard Dodd, II ("Dodd"), in order to save costs in construction, utilized the talent of an in-place staff from a prior business operation also owned by Defendant and a project manager to coordinate the administration and construction of the Project.

        3.      The Project was financed by numerous Federal, State, and City loans and grants as well as a construction line of credit and permanent financing by Metro Bank. During the Project's construction, Defendant experienced extreme delays in receiving

reimbursement from the Commonwealth of Pennsylvania under a grant program known as RACP grant.  Under the RACP Program, Defendant was reimbursed by the Commonwealth of Pennsylvania for construction costs paid in advance from funds paid from the CRE's Metro Bank line of credit.

4.      The delays in obtaining funding from the RACP Program, in one instance, exceeded over six (6) months and in an other, four (4) months.  As a result of this delay, CRE was challenged in maintaining an orderly and consistent draw on its line of construction credit provided by Metro Bank.

5.      Additionally, draws sought by CRE from the Loan Agreement with the City under the HUD Section 108 Program, were constantly late and not distributed in accordance with the loan documents with the City which provided for payment within 15 days of CRE's submission of draw requests.

> 2.      **The Loan Agreements – Section 108 Community Development Block Grants (CDBG)**

6.      CRE received part of its financing for the Project pursuant to two (2) loan agreements from the County of Dauphin and the City of Harrisburg (Defendant Exhibit Nos. 55 and 56).  The terms of the Loan Agreements with the County and City were exactly the same.  The monies funding the loans were derived from funds of private investors whose investment (principal and interest) is guaranteed by HUD under the Section 108 CDBG program.

7.      CRE's use of the proceeds of the loan were restricted and could be distributed solely to pay for "eligible expenses" for the Project.  The "eligible expenses" for which proceeds borrowed from the loans could be used to pay are set forth at 24 C.F.R. §570.203.  Eligible expenses are specifically defined as "the acquisition, construction...of

commercial or industrial buildings, structures, and other real property, equipment, and improvements." (Defendant's Exhibit 57 and 24 C.F.R. §570.203(a).)

8.      The County and City Loan Agreements provide for a note and a recorded second mortgage against the Project Site and Mr. Dodd's personal guaranty. (Defendant's Exhibits 55 and 56.) The terms of the Loan Agreement do not restrict draws from the loan to be used solely for the payment of the contractor's Payment Application upon which the draw was issued or that the draws to be issued in both the name of the Owner and Contractor. Instead, the Loan Agreements merely states requirement of the loan proceeds may only be used in compliance with the regulations described in 24 C.F.R. Part 570 which defines "eligible expenses". (Defendant's Exhibits 56 and 55 Article IV.)

9.      Dodd was at the time and still to this date, not aware of any federal regulation or OMB circular directive that limits payment of draws made from such loans solely to the contractors which a loan draw references when such contractor Payment Application later become ineligible to pay. Moreover, Dodd was unaware of any regulatory requirement of sequestration or entrustment of the draw of such funds for the benefit of contractors.

10.      The Project's Construction Contract places no limitations of the Owner's use of such draws. (Defendant's Exhibit 2.)

11.      The Government produced no regulations restricting the use of such draws or any contract clause in the Loan Agreements or the Construction Contract restricting the use of such draws to solely pay the contractors' Payment Applications. (Connor N.T. 111 L. 12-21; Davis N.T. 158 L. 23-25; 158 L. 1-5 and 159; L. 5-11; Possinger N.T. 178 L. 14-15) The only restriction on the Owner's use of such draws set forth in the Loan Agreement is

that they be used to pay the "eligible expenses" of the Project.  24 C.F.R. §570.203.

12.    George Connor, Dauphin County, testified an audit of the loan was undertaken and no 108 CDBG monies were spent for anything other than "eligible expenses." (Connor, N.T. , l. 13-19.)

3.    **The Construction Contract**

(i)    **The Contract Provisions**

13.    Each of the contractors identified by the United States in this proceeding as a potential "victim", entered into a contract known as an Owner/Contractor Agreement.  (Defendant's Exhibits 1, 27, 32, 38, 41, 65, 72, 80, and 83).  Each of the Owner/Contractor Agreements entered into with the various contractors in this matter were identically worded except for the description of the work to be provided and the amount to be paid to the contractors for its work.  (See as an example Defendant's Exhibit 1.)

14.    Article 1 of the Owner/Contractor Agreement incorporated the documents identified in Paragraph 1.1.2 of the Instructions to Bidders and other documents and submittals required to be made.  Section 1.1.2 of the Instructions to Bidders, in part, incorporated by reference the following documents:

1.1.2    The Contract Documents consist of:

(a)    Agreement between Owner and Contractor;

(b)    Conditions of Contracts (AIA Document A201-1997, as amended);...

(f)    Davis-Bacon Prevailing Wage Predetermination;

(j)    Pennsylvania Regulatory Requirements;

      (k)    Pennsylvania Public Works Regulatory Requirements;...

      (m)    General Regulatory Requirements; and

      (n)    Federally Funded Project Requirements.

(Defendant's Exhibit 2, ¶1.1.2, p. 2.)

Each of the incorporated documents were set forth in the Non-Technical Specifications of

Volume 1 of 7, Bidding Requirements, Contract Requirements, and General Requirements

(hereinafter collectively referred to as the "Construction Contract").  (Defendant's Exhibit 2.)

      15.    Article 2 of the Owner/Contractor Agreement provided that the

contractor would perform all the "Work" required by the Construction Contract for the

construction of the Capitol View Commerce Center.  Article 1 of the General Conditions of the

Contract for Construction at Paragraph 1.1.3 defines the term "Work" as meaning "construction

and services required by the contract document, whether completed or partially completed, and

includes all labor, materials, equipment and <u>services</u> (emphasis provided) provided or to be

provided by the Contractor to fulfill the Contractor's obligations."  (Defendant's Exhibit 2, AIA

Document A201-1997, ¶1.1.3, p. 11.)

      (b)    **Regulatory Provisions of the Contract.**

      i)    **Steel Certificates**

      16.    The General Regulatory Requirements of the Construction

Contract required contractors to comply with the more stringent provisions of either the Buy

America Act or the Steel Products Procurement Act Section 3.9A and C.  The Buy America Act

provides that construction projects funded by federal loans or grants or are federally guaranteed

which incorporate steel and iron products materials into the construction of the project must have

100% of its origin in and be manufactured in the United States.  The Buy America Act mandates two (2) requirements as concerns steel incorporated in the Project:  (1) the steel had its origin in; and (2) was manufactured in the United States which facts had to be set forth in every fabricators' certification received by the contractor and delivered to an owner.  (Goodman, N.T. 633, l. 3-7 and Defendant's Exhibit 2, General Regulatory Provisions, §3.9A Section 0805-7.)

17.    Section 3.9C also incorporated the provisions of the Steel Products Procurement Act which provides that only steel products as defined under that Act would be used or supplied in the performance of the contractor or any subcontracts thereunder.  The Steel Products Procurement Act requires construction projects that are funded by the Commonwealth of Pennsylvania steel and iron products incorporated in the construction of the project must have 75% of its manufacture in the United States.  (Defendant's Exhibit 2, General Regulatory Requirements, §3.9C, p. 805-7.)

18.    Section 3.5A 1 of the Regulatory Provisions of the Contract define "Manufactured in the United States" to mean that all manufacturing processes starting with the initial mixing and melting through the final shaping and coating processes must be undertaken in the United States.  (Section 3.9A 1.)  The General Regulatory Requirements of the Construction Contract states in performance of the contractor's Work, the construction shall use only:  (1) steel products, rolled, shaped, drawn, extruded, forged, cast, fabricated, or otherwise similarly processed by a combination of two or more such operations, from steel made in the United States by open hearth, basic oxygen, electric furnace, Bessemer, or other steel making process; or (2) cast iron products made in the United States.  (Defendant's Exhibit 2, Section 3.9C 1.)

19.    Steel products, by definition, included machinery and equipment.

(Section 3.5C, Page 0802-2.)

20.     The Contract specifies no payments would be made to a contractor for Work that incorporated steel and cast iron products until steel mill certifications required by the Buy America or Steel Products Procurement Act were received by the Owner.  (Section 3.9C 2.)  A contractor, who did not provide mill certification that all steel and cast iron products that were incorporated into its Work had its origin in and was manufactured in the United States, could not be paid.

ii)     **Davis-Bacon Wage Certifications**

21.     The Contract, General Regulatory Requirements, also incorporated the provisions of the Davis-Bacon Wage Act.  The General Regulatory Requirements were incorporated into the Contract pursuant to Section 1.1.2(m) of the Bidding Instructions.  Under the Davis-Bacon Act, workmen on the Project had to be paid no less than such general prevailing minimum wage rates and applied not only to the contractor but also to the contractor's subcontractor.  (Sections 3.1 and 3.5.)  The workmen also had to be paid in accordance with the classifications set forth in the decisions of the Department of Labor.  (Section 3.5A and E.)

iii)     **Contract Payment Provisions**

22.     Article 3 of the Owner/Contractor Agreement stated that the Owner was to make progress payments on account of the contract sum to the Contractor as provided in the General Conditions of the Contract  (Defendant's Exhibit 1, Article 6.)

23.     The General Conditions/Requirements of the Construction Contract provided payment by the Owner was to be made to a contractor for its Work "after Local, State, and Federal entities involved in the funding had completed the necessary

processes." (Defendant's Exhibit 2, General Conditions, Section 1.5C 3, p. 01290-3.)

24.    "Work" is defined under the contract in Section 1.1.3 of the General Conditions of the Contract as meaning "construction and services required by the contract documents...and includes all labor, material, and services provided to fulfill the Contractor's obligations." (Defendant's Exhibit 2, General Conditions, p. 11.)  One of the services required pursuant to the definition of Work were the certifications by the contractors that its Work has been pursued in compliance with Davis-Bacon Act together with the Buy America Act and the steel mill certifications of compliance with the more stringent provisions of the Buy America Act and Steel Products Procurement Act with regard to the steel products incorporated into the "Work." (Defendant's Exhibit 2, Regulatory Provisions, §3.9 0805-7.)

25.    The payment application procedure set forth in the Contract provided that Contractors use AIA document G702 and G703 (continuation sheets) as the form for application of payment. (Defendant's Exhibit 2, Section 1.5D, p. 1209-3.)  The general requirements for payment also required that the contractors complete every entry on the form G-702 and that a person authorized to sign legal documents on behalf of the contractor sign and have notarized the AIA document G702.  General requirements of the contract also set forth that each contractor had to submit four (4) signed original copies of each application for payment to the architect and one (1) copy to the owner. (Defendant's Exhibit 2, § 1.5F p. 01290-3.)  Each Payment Application was to have attached to it a Wage and Workforce Certification containing documentation of Davis-Bacon Wage compliance on a United States Department of Labor payroll form WH-347 and also submit a City of Harrisburg Workforce Report. (Defendant's Exhibit 2, § 1.5H, p. 01290-4.)

8

26.     The contractors' Payment Applications states that the contractor certifies to the best of the contractor's knowledge, information, and belief the Work covered by the Application for Payment has been completed in accordance with the contract documents. (See AIA Document G702, Defendant's Exhibit 2, Section 0600.)

27.     Dodd, upon receipt of the Payment Application, was to pass the Application on to the architect or engineer who reviewed the Payment Application and the Application would be forwarded to the appropriate lending sources for review.  The processing of the Application for Payment, did not constitute an approval of the Contractor's Work.  The execution block of the Application specifically states:

> In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information, and belief the Work has progressed as indicated, the quality of the Work is int accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED. ... $_____.

(Defendant's Exhibit 2, Section 0600, AIA Document G702-1992).

28.     CRE would request a draw under the Loan Agreements from each of the funding sources.  The draws were payable to CRE or Advanced.  Each of the draws received by CRE were deposited into the CRE's or Advanced's bank account.  All payments made to the contractors were paid using checks written from the CRE or Advance bank account.

29.     The General Conditions of the Contract for Construction, Section 9.4.2 provided that the issuance of a certificate of payment by the architect/engineer was not a representation that the architect/engineer had ... "(3) reviewed copies of requisitions received from subcontractors and other data requested by the owner to substantiate contractor's right to

payment."  (Defendant's Exhibit 2, General Conditions, Certificates for Payment Section 9.4.3, p. 39.)

    30. The General Conditions of the Contract contained a provision for withholding a payment to a contractor or nullification of a previously issued certificate of payment.  Specifically, Section 9.5.1 provides that the architect/engineer on behalf of the Owner could withhold a certificate of payment or, because of "subsequently discovered evidence, may nullify the whole or part of a certificate of payment previously issued to the extent as may be necessary in the architect/engineer's opinion to protect the Owner from loss for which the contractor is responsible, including loss resulting from acts and omissions described in Section 3.3.2 (Contractor's responsibility to Owner for acts and omissions of Contractor's employees and subcontractors)" because of:...

    (.7) unsatisfactory prosecution of the Work in accordance with the contract documents.

    (.8) failure to comply with government statutes, regulations, and laws.

    (.9) failure to submit required wage certification.

(Defendant's Exhibit 2, General Conditions, §9.5.1, p. 39.)

    iv) **Claims and Dispute Provisions of the Contract**

    31. The contractors, pursuant to the General Requirement provisions set forth in Section 9.7 and Section 4.39, could not stop its work or terminate the contract if the architect/engineer refused to issue a certificate of payment because the application for payment did not conform with the requirements of Sections 9.3, 9.4, 9.5, and 9.6 of the Contract, General Conditions or because of a dispute.  (Defendant's Exhibit 2, General Conditions, §4.39 and 9.7.1,

pp. 30 and 40.)

32.    Section 4.3 of the Construction Contract controlled claims and disputes between the Contractors and Owner.  During the period of the dispute, including a non-payment dispute, the contractors were required to continue prosecution of the Work and adhere to the approved Construction Schedule.  (§ 4.3.9.)  Under the Contract, General Conditions, CRE had the responsibility to attempt to resolve any and all claims between itself and the contractor. (Section 4.3.11.)  The Owner, upon receipt of a demand from a contractor for a decision, was required within 30 days to designate an individual to serve as a Claims Administrator.  Each party was required to cooperate fully with the administrative investigation conducted by the Claims Administrator.  The Claims Administrator would within 30 days of his completion of the administrative investigation issue a decision or recommendation to the Owner and contractor. The decisions and recommendations were not binding upon either party.  Any aggrieved party was allowed then to submit its claim to the Court of Common Pleas of Dauphin County Pennsylvania.  (Section 4.3.11.)  (Defendant's Exhibit 2, General Conditions, pp. 30-31.)

33.    The contractors never invoked the provisions of Section 4.3 of the Construction Contract.

v)    **Contractors' Recognition of the Work Being Public in Nature**

34.    The General Conditions of the Contract also provided for a waiver of contractor liens.  Section 13.8.1 of the General Conditions of the Contract defined the Project as a "public work" as that term is defined in the Pennsylvania Bond Law.  The Mechanics Lien Law pursuant to the terms of the Construction Contract were waived.  (Defendant's Exhibit 2,

General Conditions, §13.8.1.)  The amendments to the Pennsylvania Mechanics Lien Law which came into effect at or near the time of the construction of the Project provides for an exemption for private property which is built for a public purpose.  (49 P.S. §1303(b).)  The Project was built for a public purpose of expanding the work force and remediating a toxic waste site and met HUD's public benefits requirements.  (Defendant's Exhibit 94.)  The Contract expressly states the Contractor for itself and its subsidiaries, agreed that a lien could not be asserted on the Project and that neither the contractor nor any subcontractor nor anyone furnishing labor or materials to the contractor in connection with the Work had the right to file or otherwise assert a mechanic's or materialmen's lien or other lien against the Work or the premises upon which the Work was located or against any other property of the Owner.  (Defendant's Exhibit 2, §13.8.1 General Conditions of the Contract.)  In the event a Mechanic's Lien was filed, the contractors agreed to promptly withdraw such claim upon the request of the Owner.  (Defendant's Exhibit 2, §13.8.1 General Conditions of the Contract.)  The contractors refused to remove the liens. (Dodd, N.T. 327.)

> vi)    **Common Facts Shared by All Contractors Seeking Restitution under the MVRA**

35.    During the contractors' execution of their duties under the Contract, it become apparent that the contractors at various stages of their "Work" failed to comply either with Davis-Bacon Act Wage provisions or the Buy America Act or Steel Products Procurement Act provisions of the Contract.  (See Defendant's Exhibits 4, 5, 6, 10, 14, 15, 16, 17, 20, 21, 22, 23, 26, 30, 33, 34, 35, 36, 46, 61, 68, 69, 72, 81, and 89).

36.    The administrator of the City HUD Section 108 Program, testified that it was CRE's responsibility with respect to each contractor's Application for Payment to

12

include in its draw request the relevant wage and steel certifications required under the

Pennsylvania Regulatory Requirements, Pennsylvania Public Works Regulatory Requirement,

General Regulatory Requirements, and Federally Funded Project Requirements.  (Linda Walker,

N.T. 221 L. 21-25; 222 L. 1-25; 223 L. 1-25; 224 L. 1-25 and N.T. 225 L. 20-25 and N.T. 226 L.

1) and Defendant Exhibits 45 and 46.)

       37.    The City was aware that CRE had not withheld payments to non-

compliant contractors in the early part of the Project.  (Defendant's Exhibit 45).  The City's

contract administrator acknowledged in her correspondence to Defendant and in her testimony,

that despite the Defendant's previous failure to insist upon contractors' compliance to secure

such documentation, the City had approved payments to contractors who had failed to provide

the regulatory certifications.  (Linda Walker, N.T. 224 L. 3-19 and Defendant Exhibit45.)

       38.    It was Dodd's initial belief that the contractors, during their

performance of their Work, would eventually provide the necessary wage and steel certifications.

       39.    The County and City took the position it was the responsibility of

CRE to obtain the documentation and to secure compliance with the Federal and State

Regulatory Requirements.  (Defendant's Exhibit 46).

       40.    At a point in early March 2008, Defendant, after having made a

number of payments to contractors pursuant to Payment Applications which had not been

supported by the wage and steel certifications,  became concerned that the contractors and their

subcontractors would not or could not supply such certifications. (See, Defendant's Exhibit 2,

Section 9.4 Certificates for Payment, AIA Document A201 General Conditions of the Contract

for Construction [Section 9.4.3].)

41.    Dodd was keenly aware that ultimately it was an owner's responsibility to obtain such documentation and he could ultimately be held responsible for repayment of any of the money borrowed from the County, City, and State sources if the steel certificates were not obtained.  (72 P.S. §1885(a).)  This was also the position of the contract administrator of the HUD Section 108 funds.  (Defendant's Exhibit 45 and Goodman, N.T. 640, l. 3-18).

  vii) **Contractors Whose Payment Applications had been**
     **Received and Draws had been Distributed to**
     **Cameron Real Estate, LP**

42.    There are five (5) contractors who have requested restitution under the MVRA for draws that CRE received under the Loan Agreements with the County and City based upon their Payment Applications.  The claims of loss in this category are as follows:

  (1) H&R Mechanical ($218,513.03);

  (2) Stewart-Amos Steel, Inc. ($466,622.00);

  (3) Herre Brothers, Inc. for plumbing and electrical work
     ($70,426.83);

  (4) Joseph Stong, Inc. ($78,430.86); and

  (5) H. W. Nauman & Sons, Inc. ($26,462.00).

            (Government Exhibits 35-39.)

43.    In each instance, with the exception of H. W. Nauman & Sons, Inc., Dodd testified CRE or Advance had received a draw from either the County or City Section 108 HUD Program based upon each contractors' Payment Application but that CRE had withheld payment of those contractors' Payment Application due to either Davis-Bacon wage or

14

Buy America steel certificate issues.

44.    Dodd testified that although he had authorized payment of a number of the contractors' Payment Applications without the supporting steel mill certificates, as well as outstanding wage certifications, he did so believing the contractors would catch up with the wage and steel certificates as their performance continued.

45.    By mid-March 2008, Defendant, after months of contractors' non-compliance, believed the only way to obtain the contractors' compliance his serious concern over the origin of the installed steel was to withhold payment for Work until the certificates were secured from the contractors.

> viii)    **Contractors Whose Payment Applications had been Received but Had Not Been Approved, Had Not Been Submitted for a Draw, or Had Been Received, Forwarded to a Lender, but for which a Draw Had Not Been Made by CRE**

46.    There are nine (9) contractors who have requested restitution under the MVRA who: (1) submitted Payment Applications which had been received and approved by CRE for payment and submitted to the County and City for approval and approval was pending; (2) submitted Payment Applications which had been received but not been approved by CRE; and (3) submitted Payment Applications which had been received and approved by CRE for payment, submitted to the County and City and draws issued but never distributed to CRE.  In other words, had never been fully approved or paid to CRE.

The claims of loss which represent the total amount of the contractors' payment applications less payments made by CRE in this category are as follows:

(1)    H&R Mechanical                $1,225,468.62 (contractual)

(2)    Stewart-Amos Steel, Inc.     $622,146.52 (contractual)

|      |                      |                             |
|------|----------------------|-----------------------------|
| (3)  | Herre Brothers, Inc. | $1,265,237.50 (contractual) |
| (4)  | Joseph Stong, Inc.   | $241,401.06 (contractual)   |
| (5)  | H. W. Nauman & Sons  | $33,672.47 (contractual)    |
| (6)  | Ciesco               | $204,852.25 (contractual)   |
| (7)  | Macri Concrete       | $266,395.50 (contractual)   |
| (8)  | Shaedler-Yesco       | $319,203.00 (contractual)   |
| (9)  | Weaver Glass         | $594,890.00 (contractual)   |

(Stipulation of claims.)

47.     There are three (3) contractors who are seeking restitution for counsel fees they claim they incurred as a consequence of attempting to collect the amounts they claim are due under the Construction Contract.  Those contractors and the amount of their claims for attorneys fees are as follows:

|     |                      |                        |
|-----|----------------------|------------------------|
| (1) | Herre Brothers, Inc. | $194,198.79 (legal)    |
| (2) | Joseph Stong, Inc.   | $84,332.50 (legal)     |
| (3) | Weaver Glass         | $47,561.29 (legal)     |

(Stipulation of the parties).

48.     Defendant testified and the documents prove that each of these contractors with the exemption of H.W. Nauman, had outstanding Davis-Bacon Act Wage certification or Buy America steel certification issues at the end of April 2008 which precluded either payment or submission of their Payment Applications.  (H&R Mechanical Defendant's Exhibit 4, 5, 6, 7, and 68; Stewart Amos Defendant's Exhibits 9, 10, 11, 12, and 13; Defendant's Exhibits 14, 15, 16, 17, 44, and 69; Joseph Stong Defendant's Exhibits 18, 19, 20, 21, 22, and

16

23; Herre Brothers Defendant's Exhibits 33, 34, 35, and 36; Weavers Defendant's Exhibits 73, 74, and 75; Crisco Defendant's Exhibit 39, 82, and 90; and Macri Concrete Defendant's Exhibit 84; either payment or submission of their Payment Applications.  H. W. Nauman & Sons Affidavit of Payment of Subcontractors was drafted in a way that stated Nauman still owed a subcontractor $502,771.00 and was never corrected.  (Defendant's Exhibit 7.)  Defendant also testified a great number of the Payment Applications were received from the contractors by CRE at a time when funding had been suspended by his lending sources.  (See as example the invoices of Herre Brothers, Inc., H&R Mechanical, Joseph Stong, Inc., Weaver, and Marchi.)

49.    Instead of sequestering the funds he had received, Mr. Dodd testified he used the proceeds, instead of CRE's line of credit, to pay other "eligible expenses" for the Project in accordance with the Loan Agreements he had with both the County of Dauphin and the City of Harrisburg and pursuant to the regulations at 24 C.F.R. §570.203 Special Economic Development Activities.  (Dodd, N.T. 305.)

50.    Under 24 C.F.R. §570.203, a recipient of CDBG funds (Section 108 HUD funds) for Special Economic Activity may use those funds to pay eligible expenses which is defined by that Section "as the acquisition, construction...of commercial or industrial building, structures, and other real property, equipment, and improvements...."  (24 C.F.R. §570.203.)

51.    Dodd, in support of his testimony, produced a chronological list reflecting payment made by CRE to contractors and vendors for "eligible expenses" for the Project which CRE paid utilizing the monies that had been obtained from the draws CRE had secured from the County and City based upon the contractors' Payment Applications.

17

(Defendant Exhibit 79.)

      52.      Sequestering of the loan proceeds was not employed by the Defendant as it would have required CRE to borrow against its line of credit and incur additional and unnecessary debt service expense.

      53.      Just prior to the Project being shut down, CRE and Advance had pending RACP reimbursements equaling $429,000.00, coupled with the balance of construction funds in CRE's account equaling $170,000.00 and the available balance of $650,000.00 from CRE's line of credit with Metro Bank , was sufficient to pay the five contractors the $840,000.00 in Payment Applications had been used to support draw requests conditioned upon their providing Davis-Bacon Act wage certificates and Buy America steel mill certificates.  (Dodd, N.T. 495, l. 14-23.)

      54.      The United States has never alleged nor did it introduce any evidence that the Defendant used the money loaned by the County and City based upon the contractors' Payment Applications to pay anything other than "eligible expenses" under the provisions of the Loan Agreements between CRE and the County or City.

      55.      Defendant pleaded guilty to the charges of Misappropriation of Federal Funds (18. U.S.C. §666(a)(1)(A) (Count 2) and Money Laundering (18 U.S.C. §1956(a)(1)(B)(i) (Count 7) of 1:CR-10-183.  Defendant also agreed to the civil forfeiture of assets listed in Count 11 at Paragraphs 2(a)–(e), (h) and (i).  In 1:CR-11-003, Defendant agreed to the civil forfeiture of assets listed in Count 11 of Paragraph 2c.  In return for Defendant's plea, the United States agreed to move for dismissal of any remaining counts in both cases following sentencing.  (Plea Agreement).

56.     The essence of the criminal case revolves around CRE's contracting with a corporation known as IDC, Inc. to perform the pre-cast concrete Work of the building project.  Unknown to the City, County, State, and private financing lenders was the fact that Defendant had an inappropriate equity ownership interest in IDC, Inc.  Pursuant to the federal regulations, Mr. Dodd was not to have an interest in any entity which did work on the Project as such interest was prohibited under relevant federal regulations.  At all times relevant hereto, this fact **did not** become known to anyone, but the City HUD administrator, however, until months after the financing for the Project had been terminated.  The Project collapsed due to factors unrelated to Mr. Dodd's interest in IDC, Inc.; CRE's use of monies borrowed from Metro Bank to capitalize IDC; or IDC's performance of its contract.

57.     Defendant pleaded guilty to Count 2 of the Indictment that he had misappropriated funds paid to IDC, Inc. which had been received by CRE from HUD Section 108 CBDG funds for Work successfully completed on the Project.  Defendant additionally pleaded guilty to investing the money paid to IDC, Inc. into a separate third party trust that he had created and over which he had control in order to hide his inappropriate equity interest in IDC, Inc.

4.     **Specific Facts of the Claim for Restitution of Each Contractor.**

i)     **H&R Mechanical**

58.     H&R Mechanical entered into an Owner-Contractor Agreement with Cameron Real Estate to provide structural steel fabrication Work within the Project (Defendant's Exhibit 1).  The Owner-Contractor Agreement incorporated by reference the terms

19

and conditions of the documents identified in ¶1.1.2 of the Instruction to Bidders, the Contract

Documents described in Paragraphs 1.1.2 of the Bidders Instructions and the project manuals

(Defendant's Exhibit 2).  The Contract Documents included a the definition of Work and the

regulatory requirements of the Federal and State governments concerning payment of prevailing

wages (Davis-Bacon Predetermination) and Steel Products Procurement Act and the Buy

America Act.

59.    The evidence supports a finding that CRE paid H&R Mechanical

was paid by CRE  $358,477.20 on its Payment Application Nos. 1, 2, and 3.  (Bailey N.T. 22 L.

8-17 and N.T. 40 L. 9-21).

60.    Mr. Bailey and H&R Mechanical testified that based upon the

terms of the Construction Contract, because H&R Mechanical had failed to provide steel mill

certifications for Payment Applications 2 and 3, H&R Mechanical should not have been paid for

Payment Applications 2 and 3.  (Bailey N.T. 46 L. 23-25 and N.T. 47 L. 1-5).

61.    The evidence reflects Defendant drew $218,513.03 from the City

Loan Agreement based upon H&R Mechanical's Payment Application No. 4 and withheld

payment of Application No. 4 from H&R Mechanical.  (Bailey N.T. 10, L. 20-23).

62.    In early April 2008, just after CRE's paid H&R Mechanical's

Payment Application No. 3, Dodd noted that steel incorporated into H&R Mechanical's Work

had not been supported by steel mill certificates required under the Buy America Act.

(Defendant's Exhibit 3).

63.    Defendant received H&R Mechanical's Payment Application Nos.

5, and had submitted it to the City for payment but the City suspended payment because of a call

made by Mr. Bailey to the City's controller.  (N.T. 22 L. 18-25 and N.T. 23 L. 1-2 and N.T. 42 L. 4-12).  Applications Nos. 6 and 7 were never submitted to the City because by the time they were received by CRE, the City had suspended its financing of the Project.

64.    H&R Mechanical testified it suffered a loss of $1,225,468.62 as the result of its contract with Defendant.  H&R Mechanical also allegedly paid its attorneys $56,267.72 in attempting to collect on its claim.  (Bailey N.T. 10 L. 1-8).

65.    Mr. Bailey alleges he knew that the Construction Contract provided H&R Mechanical was required to provide Buy America steel mill certificates but claims Mr. Dodd never asked for them.  (Bailey N.T. 13 L. 2-7).

66.    Mr. Bailey claims that once the Buy America steel certificates were requested by Mr. Dodd, he immediately provided them to Mr. Dodd.  (Bailey N.T. 13 L. 7-12)

67.    Mr. Bailey testified that after receiving correspondence from CRE demanding the steel mill certificates, he provided all of them.  (Bailey N.T. 23 L. 13-23).

68.    The records show that despite Mr. Bailey's assertion that records were provided immediately, his partner Mr. Hiner on April 18, 2008, was writing to CRE asking how many copies of the steel mill certificates were needed.  (Defendant's Exhibit D-4).

69.    Mr. Bailey then identified in Exhibit's Exhibit 5 that steel mill certificates were being submitted on April 30, 2013; May 12, 2013; May 15, 2013; and June 3, 2013.  (Bailey N.T. 25 L. 5-25 and N.T. 26 L. 1-4).

70.    Bailey could never state that all of the steel mill certificates to substantiate H&R Mechanical's Payment Applications had been secured for its Work even though he stated the government had all his steel certificates (N.T. 23 L. 17-20) (Bailey N.T. 27

L. 22-25).

71.    Mr. Bailey admitted the Construction Contract states that contractors are not to stop their work in the event of a payment dispute.  (Bailey N.T. 36 L. 6-12).

72.    Mr. Bailey admits there was a process for adjusting claims provided for in Section 4.3.9 of the Construction Contract that required the contractors  to pursue their work even through there is a dispute between a contractor and an Owner and prior to filing a lawsuit, Mr. Bailey also admitted the claims procedure set forth a scheme of resolving the dispute was a condition precedent to filing a civil action.  (N.T. 36 L. 13-25 and N.T. 37 L. 1-9).

73.    Mr. Bailey, on behalf of H&R Mechanical never attempted to resolve the dispute utilizing the resolution section of the Construction Contract.  Instead, H&R Mechanical stopped its work, filed a lawsuit, filed a mechanic's lien, and walked off the job site. (Bailey N.T. 37 L. 12-25).

74.    Mr. Bailey agrees that the Buy-America provisions of the Construction Contract applied both general steel items and machinery.  (Bailey N.T. 49 L. 12-16).

75.    Defendant, in order to secure compliance with the Buy America Act, began attempting to obtain the steel mill certificates for all the various steel components incorporated into H&R Mechanical's work.

76.    Ultimately the responsibility for obtaining mill steel and wage certificates were the Defendant's responsibility.  Defendant testified he took the responsibility seriously as he knew he could be ultimately found to be financially responsible for having paid contractors and not securing the certifications.

22

77.    At or near the same time, Defendant became aware of the fact that one of H&R Mechanical's subcontractor, MCA, had an open Davis-Bacon Act Prevailing Wage compliance issue. (Defendant Exhibits No. 18 and 29). As of June 20, 2009, H&R Mechanical still had outstanding Davis-Bacon Wage Certification issued (missing payroll) with the Department of Labor (Defendant Exhibit 63).

78.    In order to secure H&R Mechanical's compliance with the regulatory provisions of the Construction Contract, Defendant withheld payment to H&R Mechanical for Payment Application No. 4 in the amount of $218,513.03. The failure to provide steel mill certifications involved more than one (1) steel mill certificate and included steel mill certificates from the manufactures of all the steel products and machinery incorporated into H&R Mechanical's Work. H&R Mechanical and other contractors allege Defendant's position was contrived, that steel mill certificates had been previously provided, that the steel mill certificates would be provided by the end of their Work, that it was common practice to provide steel mill certificates at the conclusion of Work, and the Defendant's refusal to pay was being made in bad faith, Defendant's position was taken merely to delay rightful payment to H&R Mechanical under the Construction Contract, the proceeds of the draw made upon the City Loan Agreement using H&R Mechanical's Payment Application had been used to pay an outstanding obligation owed to IDC. The facts of the case, however, do not support H&R Mechanical's position.

79.    On April 19, 2008, Scott Davis, Project Administrator, wrote to Mr. Bailey regarding his inquiry concerning payment of Application No. 4, in the amount of $218,531.03. Mr. Davis advised Mr. Bailey that CRE had absolutely no steel certificates in its file from H&R Mechanical, that the Work represented in Application No. 4 involved the

incorporation of steel products, and that the steel mill certificates were required before payment could be made on the Application.  (Defendant's Exhibit 3).

80.    On April 28, 2008, H&R Mechanical responded to Mr. Davis' inquiry.  H&R Mechanical did not contend the steel certificates had been previously provided but, instead, asked how many copies of steel mill certificates would be needed.  (Defendant's Exhibit 4.)

81.    Over the course of the next 35 days H&R Mechanical began to supply steel mill certificates to CRE for some but not all of the steel incorporated in the H&R Mechanical's Work.  (Defendant's Exhibit 5.)

82.    A close review of the steel mill certificates that were submitted by H&R Mechanical reveal most were obtained from manufactures between April 24, 2008 and April 28, 2008, and that only one (1) complied with the 100% regulatory requirement of the Buy America Act (Defendant Exhibits 5 and 6).

83.    The steel mill certificates were forwarded to CRE by H&R Mechanical between April 28, 2008 and June 2, 2008.

84.    Mr. Bailey could not state that all the steel mill certificates required to be submitted to CRE for Work under the Contract had been secured from all the steel incorporated into the Project.  (Bailey, N.T. 23-25).

85.    In fact, only eight (8) out of the twenty (20) steel mill certifications required under the Contract were ever received from H&R Mechanical (Defendant Exhibit 6).

86.    In the meanwhile, on April 21, 2008, despite H&R Mechanical's non-compliance with the Regulatory provisions of the Construction Contract, H&R Mechanical's

president, Mr Bailey, began to make inquiries of the City whether CRE had been paid a draw based upon H&R Mechanical's Application No. 4.  In attempting to discover the draw status, Mr. Bailey also contacted Ms Lark, labor specialist, to determine the status of the hold on H&R Mechanical's Payment Application No. 5. (Defendant Exhibit 86).

87.     Mr. Bailey represented to Ms. Lark that H&R Mechanical had submitted all Davis-Bacon wage certifications to CRE with their Payment Applications.  This was not true.  This finding is supported by Federal Prevailing Wage Report dated April 21, 2008 (Defendant Exhibit 28) and Federal Prevailing Wage Report dated June 20, 2008 (Defendant Exhibit 63) which both reflect H&R Mechanical's subcontractor, MTC Excavators, had outstanding prevailing wage issues (April 21, 2008) and H&R Mechanical had missing payroll reports for the period April 5, 2008 – April 26, 2009 (Defendant Exhibits 28 and 62).

88.     Mr. Bailey, not satisfied with the answer he had received from the City and Ms. Lark, engaged counsel, Mr. Timothy Woolford.  Mr. Woolford wrote to CRE about payments allegedly due to H&R Mechanical.

89.     On May 1, 2008, CRE's counsel responded, advising Mr. Woolford of that H&R Mechanical's Application Nos. 4 and 5 were not properly documented.  Specifically, CRE's counsel advised Mr. Woolford that the City of Harrisburg had requested CRE not to issue payment to H&R Mechanical as concerns Application Nos. 4 and 5 until steel mill certifications had been secured from H&R Mechanical.  Once the required steel mill certificates were provided, payment on Application No. 4 would be made and Payment Application No. 5 would be processed.  (Defendant Exhibit 8.)

90.     Mr. Bailey denied any knowledge of CRE's counsel's letter

25

(Bailey, N.T. 38 L. 9-15.)

91.     On or about May 5, 2008, H&R Mechanical, instead of invoking the provisions of ¶4.3 Claims Disputes of the General Conditions of the Contract for Construction (Defendant's Exhibit 2, p. 29-31) and walked off the job site.

92.     On May 8, 2008, H&R Mechanical, contrary to its contractual agreement not to do so, filed a mechanic's lien claim in the Court of Common Pleas of Dauphin County at 2008-CV-5370-ML (Government Exhibit 34), and eventually filed a breach of contract cause of action in the Dauphin County Court of Common Pleas at 2008-CV-7853.

93.     All of these actions were contrary to the provisions of §4.3.9-§4.3.11 of the General Conditions of the Construction Contract which required a contractor to resolve the dispute pursuant to the terms of the Contract and to exhaust these remedies prior to the filing of an action in the Court of Common Pleas. (§4.3.11 General Conditions of the Contract for Construction.)

94.     The filing of a mechanic's lien claim violated §13.8 of the Construction Contract wherein contractors waived acknowledged the Project to be a public work, the right to file mechanic's liens in light of the fact the Project was a public work, and agreed it would remove such liens upon an Owner's demand.  (§13.8.1 General Conditions of the Contract.)

95.     The evidence supports that the Project's lenders totally  suspended funding of the Project in mid-May 2008.  The suspension of the funding was as the direct result of Dodd's withholding payment to H&R Mechanical and other contractors for their failure to provide steel mill certifications and wage and hour certifications and their filing mechanics liens.

96.     H&R Mechanical and other contractors in walking off the site; filing mechanic's liens claims; and filing civil actions, were all acts prohibited by the terms of the Construction Contract. (§§4.3.9; 9.7.1; 13.8.1; and 4.3.11. and 13.8.1)

97.     The evidence supports a finding that at April 30, 2008 CRE was awaiting reimbursement of $579,000.00 under the RACP Program grant (Dodd N.T. 333, L. 9–11 and Defendant Exhibit 77); $797,226.52 in pending payments from the City (Dodd N.T. 333, L. 12–14 and Defendant Exhibit 77), had an open line of credit with Metro Bank in the amount of $6,900,000.00 (Dodd N.T. 332, L. 11–25 and N.T. 333, L. 1-8); $175,000.00 in CRE's bank accounts (Dodd N.T. 369, L. 11–15); and a pending $150,000.00 grant from the City (Dodd N.T. 333, N.T. 15–23).  The sums were more than adequate to pay H&R Mechanical's Application No. 4.  upon filing of the proper steel mill certificates (Defendant Exhibit 77.) Suspension of the financing, however, was never lifted because H&R Mechanical and other contractors, despite being requested to pursuant to the Construction Contract, would not discontinue the mechanic's lien claims and civil actions that had been filed.  (Dodd, N.T. 327.)

98.     H&R Mechanical did not in anyway attempt to identify what the $1,250,000.00 loss represented in terms of costs of materials; cost of labor; work not performed; work performed but not approved either by Dodd or the appropriate funding source; profit; or included a credit for returned materials and did not state what percentage of its Work it had completed on the Project.

99.     H&R Mechanical did not testify as to the purpose of engagement counsel, what the fees related to, how much of the fees were incurred in the investigation or prosecution of Defendant's criminal conduct in the case versus fees for the attempt to collect the

monies owed to H&R Mechanical, and whether the fees were paid.

100.    There is simply no evidence before the Court that H&R
Mechanical's counsel fees were incurred in the investigation and prosecution of the Defendant's
criminal conduct.  The MVRA does not provide for the entry of an order of restitution for
consequential or incidental damages, such as counsel fees.  (See, <u>Government of the Virgin
Islands v. Davis</u>, 31 D.I. 332, 43 F. 3d 41, 46 (3rd Cir. 1994) and <u>United States v. Simmonds</u>, <u>Id.</u>
at 833.)

101.    There is no evidence of how Defendant's interest in IDC, Inc., his
partial payment of IDC's contract and his hiding of his interest in the same was a substantial and
real factor in causing H&R Mechanical's loss.

102.    The last payment made to IDC, Inc. occurred on April 20, 2008 in
the amount of $576,000.00.  The funds to pay IDC came from a draw against CRE's line of
credit at Metro Bank, the borrowing limit which had been increased as the result of CRE's
receipt of reimbursement from the RACP grant and not from Section 108 Funds.

103.    The funds used to pay IDC were not ones dedicated to the payment of any of the
other contractors including H&R Mechanical.

104.    There is no evidence that IDC had not properly performed its
contract or that the money paid to it was not otherwise an eligible expense of the Project.  Thus,
the Defendant's conflict of interest and his payment of the obligation owed to IDC was not
directly and proximately related to Defendant's failure to pay the contractors.  Defendant's
suspension of the payment to the contractors was due to their failure to provide wage and steel
mill certifications for the Work each had performed at the Project.  The right to withhold the

28

payment was provided for under the Contract.  (Defendant's Exhibit 2).

105.    The Government did not prove that the contractors' loss was directly caused by Defendant's criminal conduct or that Defendant's payment of IDC, Inc. on April 20, 2008 left CRE incapable of paying H&R Mechanical.

106.    The evidence supports a finding CRE had the financial ability up to the point the lenders suspended financing to pay not only H&R Mechanical its $218,513.07 but also the amounts owed to other contractors whose Payment Applications had been used to support draws.

107.    In short, the cause of H&R Mechanical's and the other contractors' losses had nothing to do with Defendant's criminal conduct or were so far attenuated in terms of facts and time as not to be a substantial factor of the contractors' loss.  Thus, H&R Mechanical and the other contractors are not MVRA victims.

108.    There is no evidence to prove the Work performed by H&R Mechanical beyond Application No. 4 had been approved by the engineers and architects or the funding sources.

109.    There is no evidence that as concerns the steel and steel products incorporated in the Work represented by Payment Application Nos. 1 through 7 were supported by the proper Buy America Act steel certificates.  Steel mill certificates were still outstanding in July 2008 and as Mr. Bailey testified he could not say all the required steel certificates were ever provided by H&R Mechanical.

110.    The evidence supports a find that CRE ever received any draws from the Loan Agreements in relation to H&R Mechanical's Payment Application Nos. 5, 6, and

7.

111.    Attorneys fees under MVRA are not defined as a reimbursable loss
if they are not related to investigation costs as they are incidental and consequential damages and
such are not reimbursable under the provisions of MVRA. United States v. Simmonds, 253 F. 3d
826, 833 (3rd Cir. 2000).

### (ii)    Stewart-Amos Steel, Inc.

112.    On May 31, 2007 Stewart-Amos Steel entered into an Owner-
Contractor Agreement with Cameron Real Estate to provide structural steel fabrication Work
within the Project.  (Defendant Exhibit 38.)  The Owner-Contractor Agreement incorporated by
reference the terms and conditions of the documents identified in ¶1.1.2 of the Instruction to
Bidders, the Contract Documents described in Paragraphs 1.1.2 of the Bidders Instructions and
the project manuals.  The Contract Documents included a the definition of Work and the
regulatory requirements of the Federal and State governments concerning payment of prevailing
wages (Davis-Bacon Predetermination) and the more stringent provisions of either the Steel
Products Procurement Act or the Buy America Act.

### Stewart-Amos Steel, Inc.

113.    Stewart-Amos Steel, Inc. claims $661,858.00 in losses with regard
to the Cameron Street Project.  The losses are represented by Stewart-Amos Steel, Inc.'s
Applications for Payment as follows:

|   |   | Amount | Date Received |
|---|---|---|---|
| a. | Application No. 1 | $466,622.00 | 01/28/2008 |
| b. | Application No. 2 | $129,050.00 | 03/27/2008 |

      c.      Application No. 3      $66,186.00    05/26/2008

114. Application No. 1 in the amount of $466,622.00 was submitted by CRE as draw  Application No. 8 to the City of Harrisburg and was distributed to CRE pursuant to the City Loan Agreement on or about February 25, 2008.  (Government Exhibit 36).

115. Application Nos. 2 and 3, although received by CRE were never submitted to the City for review or a draw.

116. CRE did not pay Stewart-Amos Steel, Inc. because as of May 21, 2008 the Bull Moose Tube Company Buy America steel mill submitted by Stewart Amos certificates did not identify the source of the supplied steel.  (Defendant's Exhibit 40) P3, Item 4, and Goodman N.T. 642 L.7-25; N.T. 643 L. 1-10.  As of June 6, 2008, Stewart-Amos Steel, Inc. had not been paid $466,622.00.

117. Scott Davis testified Buy America steel mill certificates were received from Stewart-Amos Steel, Inc.  The testimony of Mr. Davis was that, at times, he would secure steel certificates received from the various contractors, including Stewart-Amos Steel, Inc., only to be later told the steel mill certificates had been rejected.  (Davis, N.T. 56, L. 21–25 and N.T. 57, L. 1–6.)

118. Mr. Dodd admitted that some, not all, of the steel certificates required by Stewart-Amos Steel, Inc.'s contract had been received in December of 2007.  These steel certificate were included as part of CRE's Application No. 8 submitted to the City of Harrisburg on January 8, 2008.

119. Defendant, prior to receiving the draw from the City, however, became aware of the fact that incomplete and unacceptable steel mill certificates had been

submitted by Stewart-Amos Steel, Inc.'s subcontractor, Bull Moose Tubing, Co.  (Dodd, N.T. 297, L. 1–9.)  Support of this position is reflected in the telefaxes transmitted between Judy Evans, Stewart-Amos Steel, Inc., and Scott Davis, CRE, on February 25, 2008.  (Davis, N.T. 70, L. 2–15 and Defendant Exhibit 10.)

120.    In the telefax, Ms. Evan states that Stewart-Amos Steel, Inc. had submitted eight (8) separate steel certificates in support of their Payment Application, however, at least three (3) of the steel certificates, all involving Bull Moose Tube, Co., were outstanding and Stewart-Amos Steel, Inc. was still waiting for the certifications.  (Defendant Exhibit 10.)

121.    Construction Monitoring Report No. 10, dated April 9, 2008 prepared by Herbert, Rowland & Grubic, Inc., reflected an inspection of the  Project site records revealed that the Buy America Act/Steel Products Procurement Act certification of Bull Moose Tube, Co. provided by Stewart-Amos Steel, Inc. was still incomplete due to incomplete documentation of Application for Payment No. 1.  (See, Defendant's Exhibit 12.)

122.    On April 24, 2008, Dodd had emailed Kaye Goodman, the Project auditor at Herbert, Rowland & Grubic, Inc., to determine whether or not the steel certificates received from Stewart-Amos Steel, Inc. that he had previously forwarded to her were acceptable. (Dodd, N.T. 297, L. 10–25 and N.T. 298, L. 1–6 and Defendant Exhibit 39.)

123.    On April 25, 2008, Dodd wrote to Linda Walker, the Contract Administrator for the City's HUD Section 108 Program, to ask whether or not she had heard from Ms. Goodman regarding acceptability of the steel certifications that had been previously supplied by Stewart-Amos Steel, Inc.

124.    Ms. Walker indicated that as of April 25, 2008, she had not heard.

32

(Dodd, N.T. 298, L. 7–14 and Defendant's Exhibit 39.)

125.    The steel certifications were subsequently found to be inadequate by Ms. Goodman.  On May 13, 2008, Mr. Dodd forwarded an email to Scott Davis regarding Stewart-Amos Steel, Inc.'s failure to provide proper steel certificates.  (Davis, N.T. 72, L. 13–25 and N.T. 73, L. 1–14; and Dodd, N.T. 298, L. 15–25 and N.T. 299, L. 1–16; and Defendant Exhibit 13.)  In his email to Mr. Scott, Mr. Dodd identified the Bull Moose Tube Co.'s steel certificates were in adequate as they did not identify the source of the supplied steel. (Defendant's Exhibit 13.)

126.    Mr. Davis in reply to Mr. Dodd's request that he provide the information to Stewart-Amos Steel, Inc. indicated that he would take care of it.  (Dodd, N.T. 299, L. 11--16.)

127.    A site visit by Ms. Goodman on May 21, 2008 again identified that two (2) of the Bull Moose Tubing, Co.'s steel certificates were still inadequate as they did not identify the source of the supplied steel.  (Dodd, N.T. 299, L. 17–25 and N.T. 300, L. 1–23 and Defendant's Exhibit 40.)

128.    The terms and conditions of the Construction Contract under which Stewart-Amos Steel, Inc. agreed to provide steel products required it to comply with the most stringent provisions of the Buy America Act or the Steel Products Procurement Act. (Defendant's Exhibit 2, §9.5.1.9 and §3.9(a) and (c) of the General Regulatory Requirements.)

129.    This point was covered in the Pre-Construction Job Site conference held on October 23, 2007 as Item 27) at which conference Stewart-Amos was represented. (Defendant's Exhibit 10.)

33

130.    It is clear from the correspondence being transmitted between the parties that on February 25, 2008, proper steel certifications had not been received from Stewart-Amos Steel, Inc.  This discrepancy continued from February 25, 2008 through the end of May 2008.  (Dodd, N.T. 297, l. 21-25; N.T. 298, l. 1-25; and N.T. 299, l. 1-2 and Defendant's Exhibit 40.)

131.    The  evidence supports a finding that the required steel certifications were outstanding and the reason for failing to pay Stewart-Amos Steel, Inc.'s Application No. 1 was not contrived or interposed by Defendant for delay purposes.

132.    By the terms of the Construction Contract and by law, Defendant could not pay Stewart-Amos Steel, Inc. for its Work until and unless it provided and met with the conditions precedent to receiving payment.  (See, Defendant's Exhibit 2, §9.5.1.9 and §3.9(a) and (c).)

133.    The Contract specifically provides where compliance with the provisions of the Buy America Act and the Steel Products Procurement Act are not met by a contractor, the owner is obligated not to pay a contractor for its Work.  Stewart-Amos Steel, Inc.'s right to received the amount of $466,622.00 had not been perfected.

134.    Applications Nos. 2 and 3 made by Stewart-Amos Steel, Inc., while having been received by CRE, were never submitted to the City for review or to support draw request.

135.    The Payment Applications were not supported by steel certificates and/or had been received at a time for processing when the City, County, State, and Metro Bank had suspended payments under the various loan agreements due to the actions of other

34

contractors having filed mechanics liens and walking off the job site.

136.    If the Court decides that Stewart-Amos Steel, Inc. at some point submitted the appropriate steel certificates, such evidence not having been introduced, the Government must prove that Stewart-Amos Steel, Inc.'s loss was directly and proximately caused by Defendant's criminal conduct or directly caused by his conduct during the course of the scheme.

137.    The evidence produced at the hearing supports a finding that Stewart-Amos Steel, Inc. was not paid on its Application No. 1 because the Application was not properly supported with steel certificates pursuant to the Buy America regulatory provisions of the Construction Contract.

138.    The failure to pay Stewart-Amos Steel, Inc.'s Application No. 1 had nothing to do with the Defendant having a conflict of interest in IDC, Inc. which had performed its contract, or in secreting his interest in IDC, Inc.

139.    The losses incurred by Stewart-Amos Steel, Inc. resulted from its failure to support its Payment Applications with steel mill certificates combined with the collapse of the Project when State, City, County, and private banking suspended and eventually withdrew financing.

140.    The suspension and termination of financing by the various funding sources had nothing to do with the Defendant's conflict of interest scheme or the other related criminal acts for which the Defendant was charged.

141.    There is no evidence that the manner in which Defendant's interest and control of IDC, Inc., his partial payment of IDC's eligible expenses or his hiding of his

equity interest in IDC was a substantial and real factor in causing Stewart-Amos Steel, Inc.'s loss.

142.    In relation to Stewart-Amos Steel, Inc.'s claim for Payment Application Nos. 2 and 3 into the total amount of $195,236.00, there is no evidence that CRE's architects/engineers or the funding agencies ever approved these Applications.

143.    There is no evidence that steel products incorporated in the Work were supported by the proper steel certificates.

144.    There is no evidence as to what percentage of the loss equals profit which, at this point in time, would be incidental and speculative and such damages are not recoverable under the MVRA.

145.    The monies received for the Stewart-Amos Steel, Inc. Payment Application No. 1 were received and spent to pay other eligible expenses of new construction. (Dood, N.T. 302, l. 6-18.)

146.    In final analysis, the real cause of Stewart-Amos Steel, Inc.'s losses had nothing to do directly and proximately to the essential elements of the Defendant's criminal conduct as required under MVRA as any asserted nexus is too factually and temporally attenuated to meet that standard.

**(iii)    Joseph Stong, Inc.**

147.    Joseph Stong, Inc. entered into an Owner-Contractor Agreement with Cameron Real Estate to provide Work within the Project.  (Dodd N.T. 310, L. 25 and N.T. 311, L. 1–5; and Defendant Exhibit 65.)  The Owner-Contractor Agreement incorporated by reference the terms and conditions of the documents identified in ¶1.1.2 of the Instruction to

36

Bidders, the Contract Documents described in Paragraphs 1.1.2 of the Bidders Instructions and

the project manuals.  The Contract Documents included a the definition of Work and the

regulatory requirements of the Federal and State governments concerning payment of prevailing

wages (Davis-Bacon Predetermination) and Steel Products Procurement Act and the Buy

America Act.

148.    Joseph Stong, Inc. claims a loss of $78,430.86 consisting of its

Payment Application No. 1 in the amount of $19,681.56 issued on January 29, 2008 and Payment

Application No. 2 in the amount of $55,746.30 issued on February 12, 2008.  Both Applications

were approved by CRE's architects and engineers, were utilized to support a draw application

filed by CRE with Dauphin County on February 25, 2008 and March 14, 2008.  (Government

Exhibits 38 133.)

149.    On May 6, 2008, Joseph Stong, Inc. was non-compliant with the

steel certificates and, in order to secure Joseph Stong, Inc.'s compliance with the regulatory

provisions of the Contract, Mr. Dodd withheld distribution of the $78,430.86 payment.  (Dodd,

N.T. 312, l. 5-17 ; Defendant's Exhibit 20 and Joseph Stong, Inc.'s Application Nos. 1 and 2;

Government Exhibit 38).

150.    This requirement involved certifications from all manufactures of

steel products and machinery incorporated into Joseph Stong, Inc.'s Work.

151.    Defendant took the position that he could not make distribution of

the payments owed to Joseph Stong, Inc. pursuant to ¶9.5 §9.5.1 of the General Contract

Conditions and pursuant to ¶3.9(a) and (c) of the Regulatory Provisions of the Contract which

stated no payment was to be made to a contractor who did not produce steel mill certificates that

met the more stringent requirements of the Buy America Act or the Steel Products Procurement

Act.  (Dodd N.T. 312, L. 2–25 and N.T. 313, L. 1–10.)

        152.    It had come to Dodd's attention that steel products having been

manufactured in China and Poland had been incorporated into Joseph Stong, Inc.'s Work.  (Dodd

N.T. 361–363 and Defendant Exhibits 87 and 88.)

        153.    The evidence supports a finding that by late April 2008 that Joseph

Stong, Inc. had not provided the steel mill certificates to CRE. (Dodd N.T. 313, L. 4–9.)

        154.    On May 6, 2008, Mr. Davis emailed Mr. Schlarbaum, Joseph

Stong, Inc., notifying Mr. Schlarbaum that steel certificates were missing and were needed in

order for payment to be made under the Contract.  (Dodd N.T. 312, L. 5–17; and Defendant

Exhibit 20.)  On May 7, 2008, Mr. Schlarbaum emailed Mr. Davis providing an unsigned ST-2

Steel Origin Certification together with a request for a written plan for payment.  (Dodd N.T.

313, L. 11–25 and N.T. 314, L. 1–13; and Defendant Exhibit 21.)  On May 8, 2008, Mr. Davis

wrote to Mr. Schlarbaum that the ST-2 form was not acceptable under the Buy America

provisions of the Contract.  (Dodd N.T. 14–25; and Defendant Exhibit 22.)

        155.    On May 15, 2008, Mr. Schlarbaum, Joseph Stong, Inc., emailed

CRE attaching ST-3 steel certifications from Wheatland Tube Company Allied Tube and

Conduit.  (Dodd N.T. 315, L. 3–14; Defendant Exhibit 23.)  The certification from Wheatland

Tube Company was allegedly submitted by Wheatland to its fabricator on January 20, 2008 but

as noted on the certification, only received by Wheatland Tube Company on May 12, 2008.

(Dodd N.T. 316, L. 19–25; and Defendant's Exhibit 23.)  Additionally, the steel certification only

certified 75% of the steel as either having its origin or produced in the United States and not

100% as required by Buy America provisions.

156.    The Wheatland Tube Company mill certification was incomplete as it did not contain a percentage of the cost of the articles, materials and supplies which had been mined, produced, or manufactured in the United States as required by the Buy America Act as that area of the certification was not completed.  (Dodd N.T. 316, L. 11–18; and Defendant's Exhibit 23.)  The document was not a steel mill certificate.  (Dodd N.T. 325, L. 13–25.)

157.    On May 15, 2008, Mr. Schlarbaum forwarded Allied Tube and Conduit steel mill certification indicating that Joseph Stong, Inc. had only submitted the request for mill certification to the fabricator on May 9, 2008 and had received the certification from Allied on May 9, 2008.  (Dodd, N.T. 315, l. 6-25 and N.T. 316, l. 1-18 and Defendant Exhibit 23.)

158.    By the time that Joseph Stong, Inc. had supplied these inadequate and incomplete steel mill certificates, the City of Harrisburg, Dauphin County, State, and Metro Bank had suspended loan advances to CRE and the issue of steel certifications still remained outstanding with regard to Joseph Stong, Inc.'s Work under Application Nos. 1 and 2.

159.    Joseph Stong, Inc.'s claim that its Payment Application No. 3, a part of CRE's Application No. 11, submitted to Dauphin County in the amount of $72,970.20 but the evidence supports a finding CRE never received any loan proceeds for this Application.

160.    Joseph Stong, Inc.'s Payment Application Nos. 4 and 5, while received by CRE on April 9, 2008 and May 12, 2008, were never submitted by CRE to Dauphin County as steel certifications were outstanding, the Project had been shut down and funding had been frozen.

161.    Funding of the Project was suspended as the result of Joseph Stong, Inc.'s and other contractors having filed mechanic's lien claims and filing civil actions contrary to the terms and conditions of the Contract Documents.  (Possinger, Notice of Default; Government's Exhibit 34; and see §§13.8.1; 4.3.9; 4.3.11; and 9.7.1 General Construction Contract.)

162.    There is no evidence that proceeds to pay Joseph Stong, Inc.'s Application Nos. 3, 4, and 5 were ever received by CRE from any lender.

163.    There is no evidence that Joseph Stong, Inc. ever complied with the Buy America Act or the Steel Products Procurement Act requirements with regard to the steel incorporated into its Work.  (Dodd N.T. 317 L. 20-22.  No further certificates were received from Stong).

164.    There is evidence in the record that products utilized by Joseph Stong, Inc. in the execution of its Work were foreign in origin and had in fact been manufactured in China and Poland.  (Dodd, N.T. 361-363 and Defendant's Exhibits 87 and 88.)

**(iv)    Herre Brothers, Inc. - General**

165.    The claim of Herre Brothers, Inc. is based upon two (2) separate contracts: (1) plumbing contract; and (2) electrical contract.  CRE kept two (2) separate distinct files for Herre Brothers, Inc. based upon the plumbing and electrical contract.  (Mr. McBride, N.T. 665 L. 22-25 and N.T. 666 L. 1-2).

166.    The evidence presented by the government in Government Exhibit 39 is a combination of loan draws made by CRE from the County for Work based upon Payment Application Nos. 3 and 4 submitted by Herre Brothers, Inc. for plumbing work less a credit for

CRE's payment for the electrical work as represented by CRE check number 10795.  Therefore, for MVRA purposes, there is a claim for restitution which represents a total amount billed less fund received by Herre Brothers, Inc., and net funds not remitted in the amount of $70,426.83. (Government Exhibit 39)

167.    The Payment Applications for Plumbing Work performed by Herre Brothers, Inc. were received as follows:

| | | | |
|---|---|---|---|
| a. | Application No. 1 | $28,350.00 | 11/3/07 |
| b. | Application No. 2 | $214,948.00 | 12/4/07 |
| c. | Application No. 3 | $92,233.80 | 01/8/08 |
| d. | Application No. 4 | $107,403.75 | 02/12/08 |
| e. | Application No. 5 | $910,134.55 | 03/11/08 |
| f. | Application No. 6 | $115,207.50 | 04/08/08 |

168.    CRE paid Payment Application Nos. 1 and 2 in the total amount of $243,298.80.  Payment Application No. 3 (plumbing) in the amount of $92,233.80 was utilized by CRE in its draw application No. 6 to the County on January 8, 2008 and was paid by the County on February 25, 2008 (Government Exhibit No. 39).  Payment Application No. 4 (plumbing) in the amount of $107,403.75 was utilized by CRE in its draw application No. 10 submitted to the County, which draw application was distributed by the County to CRE on April 3, 2008 (Government Exhibit No. 39).

169.    Herre Brothers, Inc.'s Payment Application No. 5 (plumbing) in the amount of $910,134.55 was used in CRE's draw application No. 11 submitted to the County on April 14, 2008 but was never distributed to CRE by the County.

170.    Herre Brothers, Inc.'s Payment Application No. 6 (plumbing) in the amount of $115,207.50 was received by CRE on April 8, 2008 but a draw application was never submitted by CRE as the Project was shut down by the time Application No. 6 was scheduled for processing.

171.    The Payment Applications for Electrical Work performed by Herre Brothers, Inc. were submitted to CRE on the following dates:

| | | | |
|---|---|---|---|
| a. | Application No. 1 | $41,615.63 | 11/14/2007 |
| b. | Application No. 2 | $54,047.34 | 12/06/2007 |
| c. | Application No. 3 | $129,210.72 | 01/10/2008 |
| d. | Application No. 4 | $180,026.73 | 02/12/2008 |
| e. | Application No. 5 | $117,246.09 | 03/07/2008 |
| f. | Application No. 6 | $221,295.06 | 04/08/2008 |
| g. | Application No. 7 | $119,693.69 | 05/07/2008 |
| h. | Application No. 8 | $48,656.08 | 06/04/2008 |

172.    Payment Application Nos. 1, 2, and 3 (electrical) were paid by CRE.  (Dodd N.T. 341 L. 4-8).

173.    Buy America steel mill certificates were outstanding, incomplete, and were received between May 9, 2008 and June 20, 2008.  (Dodd, N.T. 332-339 and Defendant's Exhibits 33, 34, 35, and 36.)

174.    Payment Application Nos. 4 and 5 (electrical) were received by CRE for payment but were never submitted by CRE to the County for approval for a draw due to steel mill certificates non-compliance issues.

175.    Application Nos. 6, 7, and 8 (electrical) were received by CRE but never utilized by CRE in a draw application as regulatory compliance issues were still unresolved on the dates that the Payment Applications were received by CRE.

176.    Application Nos. 7 and 8 were received from Herre Brothers, Inc. after the County and City had suspended payment of draw requests by CRE due specifically due to Herre Brothers, Inc. and other contractors having filed mechanic's liens.  (Dodd N.T. 341 L. 9–16).

177.    The Government claims that as a result of the manner in which CRE withheld from Herre Brothers, Inc. payments it had received pursuant to draw applications based upon Payment Applications which had been approved by CRE and processed by the County that Defendant misappropriated $70,426.83 (see, Government Exhibit 39).

**Herre Brothers, Inc. – Plumbing**

178.    On October 31, 2009, Herre Brothers, Inc. signed an Owner-Contractor Agreement for plumbing work (Dodd N.T. 318, L. 23–25 and N.T. 319, L. 1; and Defendant's Exhibit 27).  During Herre Brothers, Inc.'s execution of the plumbing contract, one of Herre Brothers, Inc.'s subcontractors, MTC Excavators, failed to submit a requested certified payroll as required by the Davis-Bacon Act Predetermination Wage Certifications.  (Dodd N.T. 320, L. 7–25 and N.T. 321, L. 9–24; and Defendant Exhibit 26.)

179.    The provisions of the Construction Contract required both the contractor and its subcontractors to comply with Davis-Bacon wage certification regulations. (Defendant Exhibit 2.)

180.    On February 20, 2008, Mr. Davis of Cameron Real Estate wrote to

43

Mr. Beuker of Herre Brothers, Inc. regarding the wage certification issue. (Dodd, N.T. 319, l. 16-25; N.T. 320, l. 1-25; and N.T. 321, l. 1-25 and Defendant Exhibit 26).  Mr. Davis requested the certified payroll of MTC Excavators to be forwarded to CRE by February 26, 2008 as CRE was meeting onsite with Carol Lark on February 26, 2008 to rectify the issue.  This did not occur.

181.    The wage certification issue regarding MTC Excavators, Inc. was still outstanding on April 21, 2008 as reflected in the Federal Prevailing Wage and Section 3 Status Report (Defendant Exhibit 28).

182.    On April 23, 2008, Defendant received an email from Ms. Lark informing him that the MTC payroll certification issue was still outstanding.  (Dodd N.T. 322, L. 25 and N.T. 333, L. 1–23; and Defendant Exhibit 29.)

183.    On April 23, 2008, Defendant wrote to Ms. Kaye Goodman with a copy to Linda Walker (City Administrator) regarding the impasse in the resolution of the MTC Excavators' wage certification issue. (Dodd N.T. 322, L. 8–24; and Defendant Exhibit 30.)

184.    Defendant, in an email to Ms. Goodman, noted that Herre Brothers, Inc. was becoming impatient, was demanding to be paid and Defendant was awaiting approval regarding compliance in order to issue payment to Herre Brothers, Inc. (Defendant's Exhibit 30.)

185.    The issue remained open throughout the month of May 2008.

186.    On May 5, 2008, Herre Brothers, Inc. walked off the job.  Herre Brothers, Inc. walk off was noted by the Defendant in an email to Mr. Conner, County of Dauphin Administrator.  (Dodd N.T. 325, L. 7–22; and Defendant Exhibit 53.)

187.    On May 7, 2008, Herre Brothers, Inc. filed a mechanic's lien for the plumbing Work that it had allegedly performed under the Owner-Contractor Agreement in

the Court of Common Pleas of Dauphin County docketed to No. 2008-CV-5336-ML. (Dodd N.T. 325, L. 23–25 and N.T. 326, L. 1–12; and Defendant Exhibit 66.)

188.    By June 2, 2008, the difficulty with MTC Excavators apparently had been partially but not totally resolved.  (Dodd N.T. 324, L. 13–22; and Defendant Exhibit 31.)

189.    MTC Excavators still owed additional restitution to four employees and Ms. Lark, in her Federal Prevailing Wage and Section 3 Status Report, indicated that a certified correction of the payroll paid to the employees would be required to verify reimbursement of restitution (Defendant Exhibit 31).

190.    On May 7, 2007, Herre Brothers, Inc. filed a mechanic's lien claim and in the claim alleged it had performed $781,780.00 in Work and had paid $243,298.80 for its Work leaving a balance of $477,009.70 due.  (Defendant's Exhibit 66.)

### Herre Brothers, Inc. – Electrical

191.    On October 31, 2007, Herre Brothers, Inc. executed an Owner-Contractor Agreement for the electrical work on the Cameron Street Project (Defendant Exhibit 32).  The Owner-Contractor Agreement specifically incorporated the provisions of Paragraph 1.1.2 of the Instruction to Bidders which in turn incorporated the General Regulatory Provision of the Contractor Agreement (Defendant Exhibit 2).

192.    Ms. Lark stated in her testimony, it was within the prerogative of the Owner to withhold payment to a contractor who was not compliant with a Davis-Bacon wage certification issue.  (Lark N.T. 253, L. 23–25 and N.T. 254, L. 1–21.)  The Construction Contract paid each week was unambiguous that each contractor on a weekly basis had to file a notarized

statement of wages.  (Defendant Exhibit 2, §3.SL 0805-5.)  The failure to provide such wage certifications gave the owner the right to withhold processing of a certificate of payment. (Defendant's Exhibits 2 and 9.5).

193.    The Prevailing Wage and Section 3 Status Report dated April 21, 2008, noted Herre Brothers, Inc., as concerns the plumbing contract, had at least two outstanding issues with regard to the journeyman/apprentice ratio being exceeded by Herre Brothers, Inc. in the payroll periods 1-15 and its  subcontractor, MTC Excavators, Inc.  (Defendant Exhibit 28.) With regard to the MTC Excavators subcontract, payrolls dating back through November 18, 2007 were being called into question.  Herre Brothers, Inc. is responsible for its subcontractors non-compliance with Davis-Bacon wage certifications.  (Lark, N.T. 16–21.)  By June 2, 2008, while a number of the issues noted in the April 21, 2008 Status Report had been corrected, there still remained outstanding issues.

194.    In late March 2008, despite Herre Brothers, Inc.'s representatives having been informed of the need to provide steel mill certificates or else payment could not be made at the Pre-Construction Job Site Conference held on October 23, 2007 (Agenda Item No. 27), it became apparent to Mr. Dodd that Herre Brothers, Inc. had not complied with the Buy America Act and Steel Products Procurement Act regulatory provisions of the underlying contract.  (Defendant Exhibit 2, Paragraph 3.9(a) and (c), Section 0805 of the Regulatory Provisions and Defendant's Exhibit 106.)

195.    Herre Brothers, Inc. had been performing its Work since October 2007, yet by April 3, 2008, CRE had not received any steel certificates from Herre Brothers, Inc.

196.    On April 3, 2008, CRE issued check number 10795 to Herre

Brothers, Inc. for Work it had performed under Payment Application No. 3 in the amount of $129,210.72 (Government Exhibit 39). Dodd, after that date, began to demand Herre Brothers, Inc. provide the steel certifications for the electrical contract as CRE had not received the steel certifications pursuant to the Regulatory clauses of the Contract. (Dodd N.T. 335 L. 1-6).

197.    On May 9, 2008, CRE received the first set of steel certificates from Herre Brothers, Inc. (Dodd N.T. 335, L. 8–16; and Defendant's Exhibit 33.) None of the steel mill certifications supplied by Herre Brothers, Inc. on May 9, 2008 complied with the 100% Buy America Act provisions of the Construction Contract. (Dodd N.T. 335, 336, and 337; and Defendant Exhibit 33.)

198.    The submission made on that date included a submission by Pass & Seymour, Legrand which had not been signed by an officer of the corporation as required under the controlling State and Federal Acts. (Dodd N.T. 336, L. 4–9; and Defendant Exhibit 33.)

199.    On May 14, 2008, two (2) ST-4 (a Pennsylvania Department of Government Services form) steel certification forms were received by CRE. (Defendant's Exhibit 34). The ST-4 documents presented on May 14, 2008 were dated by the fabrication on May 13, 2008 and an ST-4 form is used for foreign produced steel. (Dodd N.T. 337, L. 14-25 and N.T. 538 L. 1-12).

200.    A ST-4 form is a waiver of domestically manufactured steel form and is submitted for approval only when a steel product is not domestically produced in sufficient quantities. The forms, on their face, state that they must be executed by the prime contractor and submitted by an owner to the government funding source within 30 days from the date the

Professional (architect) approves the waiver on a form GSC-23 listing a "steel product" not being domestically available.  The form specifically provides no steel product may be delivered on site unless DGS (Department of Government Services) has received, reviewed, and provided written approval of the ST-4 form.  (See wording set forth on ST-4 form, Defendant Exhibit 34.)

       201.    At the time the ST-4 forms were forwarded by Herre Brothers, Inc., the steel product listed on the forms had already been incorporated into the Project by Herre Brothers, Inc.  (Dodd N.T. 338, L. 4–12.)

       202.    The ST-4 form was never submitted in advance by Herre Brothers, Inc. to CRE's engineers or architects for review.  The ST-4 form was never submitted to or approved by CRE's lenders.

       203.    On June 16, 2008, Herre Brothers, Inc. was still submitting steel mill certification forms to CRE. (Dodd N.T. 338 L. 13–21; and Defendant Exhibit 35.)

       204.    A review of Defendant's Exhibit 35 reveals that the certification was not even received by the product fabricator, Peach Tree Lighting, until May 11, 2008 and was only being forwarded to CRE on June 16, 2008.  (Dodd N.T. 17–25 and N.T. 339, L. 1–15.)

       205.    Finally, on June 20, 2008, a final set of steel mill certificates were forwarded by Herre Brothers, Inc. to CRE (Defendant's Exhibit 36).  Once again, with all the certificates filed by Herre Brothers, Inc., the certificate does not comply the 100% Buy America Act provisions of the Construction Contract and, in addition, it is not signed by an officer of the fabricator, Cooper Lighting, LLC.  (Dodd N.T. 339, L. 16–25 and N.T. 340, L. 1–8.)  The certification also indicates that it was only received by Cooper Lighting on June 13, 2008 while it was allegedly submitted by Herre Brothers, Inc. to the vendor on January 11, 2008.  Another

48

enigma wrapped in a conundrum.

206.    On May 7, 2008, Herre Brothers, Inc. filed mechanics' liens in the
Court of Common Pleas of Dauphin County docketed to No. 2008-CV-5337-ML for the
Electrical Work and at 2008-CV-5336-ML for the Plumbing Work it performed at the Project.
(Dodd N.T. 340, L. 12–23; and Defendant Exhibits 66 and 67.)  As a result of these filings the
City of Harrisburg declared a default and suspended draw and reimbursement payments that were
being processed and withheld draw payments and reimbursements that had been processed and
approved (Government Exhibit 34.

207.    As the result of Herre Brothers, Inc.'s having filed a mechanic's
lien, CRE's funds from the State, City, County, and Metro Bank were suspended and CRE could
not pay its vendors or contractors.  (Dodd, N.T. 326, l. 5-20.)

208.    Despite the testimony of Ms. Possinger and Mr. Conner, as
expressed at the time and not five (5) years later the default was declared not because contractors
had not been paid, but instead, as state in the default notice from the City,  "It has come to ones
attention that several contractors performing work for the Project have filed mechanics' liens
against the Borrower, Project, and Property ... These filings constitute defaults under Article VI
of the Revised Agreement." (Government Exhibit 34).  The contractors identified as filing
mechanics' liens were Herre Brothers, H&R Mechanical, and Joseph Stong, Inc.

209.    Defendant believed, by the terms of the contract and pertinent
regulations, he was required to withhold the distribution of funds to Herre Brothers, Inc. pursuant
to Paragraph 9.5 Section 9.5.1 of the General Contract Conditions and pursuant to Paragraph
3.9(a) and (c) Section 0805 of the Regulatory Provisions of the Construction Contract.  Those

provisions of the Construction Contract stated no payment was to be made to a contractor who did not provide steel certificates in compliance with the more stringent provisions of the Buy America Act or Steel Products Procurement Act.

210.    In mid-May through late June 2008, Herre Brothers, Inc. submitted steel certificates to CRE (Defendant Exhibits 34, 35, 36 and 37).  A review of the certificates supplied by Herre Brothers, Inc. reflect that not one of the certificates was either properly executed or did not reflect 100% origin and milling in the United States as required by the regulatory provisions of the Contract.

211.    There is no evidence that all of the steel mill certificates required to be submitted by Herre Brothers, Inc. were ever submitted to CRE in compliance with the Regulatory clauses of the Contract.  Instead, the record reflects that Herre Brothers, Inc. to be noncompliant with the steel certification provisions of the Regulatory clauses of the Construction Contract.

212.    Herre Brothers, Inc. also failed to invoke the provisions of Paragraph 4.3, Claims dispute of General Contracts, of the Contract for Construction (Defendant Exhibit 2, pgs 29-31).

213.    Instead, contrary to the terms of the Contract with Cameron Real Estate, Herre Brothers, Inc. walked off the job site, and filed a mechanics' lien and refused to remove it all in breach of Section 4.3.9, 13.8.1.

214.    This action is contrary to the provisions of Section 4.3.9 of the General Conditions which requires contractors to continue to prosecute the Work despite a dispute or disagreement.

215.    The filing of suit in the Dauphin County Court of Common Pleas was not authorized under the general terms of General Conditions of the Contract until the provisions to resolve the dispute under the terms of the Contract had been exhausted. (Defendant Exhibit 2, Section 4.3.11, General Conditions of the Contract for Construction.)

216.    The filing of the mechanic's lien complaint also violated Section 13 of the General Conditions of the Contract for Construction which provided that contractors waived the right to file mechanics liens and would remove the liens upon Owner's demand. Such liens were refused to be removed by Herre Brothers, Inc. and CRE's lenders as a result, terminated financing of the Project. (Dodd, N.T. 327, l. 20-25.)

217.    The Government claims that Herre Brothers, Inc.'s loss equals $70,426.83 (Government Exhibit 39).

218.    Herre Brothers, Inc.'s overall total loss for both the plumbing and electrical Contracts, including the $70,426.83 is alleged to equal $1,265,237.50. (Stipulation of alleged losses). The mechanics' liens for the plumbing contract

219.    The Government also introduced evidence through Mr. McBride that alleged Herre Brothers, Inc. had completed Work on the Plumbing Contract equaling $720,208.50 and had been paid $243,298.80 leaving $477,009.74 owed. The mechanics' lien for the Plumbing Work alleged Herre had completed $955,039.18 and had been paid $224,873.69 leaving $734,165.19 owed. (Defendant's Exhibits 66 and 67). The total of the mechanics' lien claim is $1,211,174.93 and not $1,265,237.50 ($477,009.74 [plumbing] and $734,165.19[electrical]). (Defendant's Exhibits 66 and 67.) Herre Brothers, Inc. also introduced evidence that it had incurred $194,198.79 in legal fees attempting to collect its losses against

51

Cameron Real Estate.  (Stipulation of Parties.)

220.    Herre Brothers, Inc. provided no evidence as to what amount, if any, was related to an investigation of the underlying criminal conduct of the Defendant but, instead, simply alleged it had been billed $194,198.79 in legal fees related to the collection of its damages.

221.    No itemized bill setting forth the hourly rate or the number of hours spent by the various attorneys working on Herre Brothers, Inc.'s collection matter against CRE were introduced at the time of hearing.

222.    As concerns Herre Brothers, Inc.'s electrical contract, there were numerous outstanding steel mill certification issues that were still unresolved during the last weeks of June 2008, a time at which the Project had been shut down for a period of six weeks. None of the steel certificates indicate the steel being incorporated into the electrical components of the Project not supported by steel certificates reflecting 100% origin and milling in the United States as required by the Buy America Act.  (Defendant's Exhibits 34, 35, 36, and 37.)

223.    Ms. Goodman, despite her position that she could not direct an owner not to pay a contractor, she on October 10, 2007 set forth a cautionary written statement to Mr. Dodd as follows:

> "Caution should be taken to ensure that all required certifications
> are received prior to payments for the related materials."

(Goodman, N.T. 362, 363, and 6373) and Ms. Walker also sets forth in writing steel mill certificates issued in accordance with the Buy America Act (100%) prior to payment being released by an Owner to a contractor who incorporated steel into their Work.  (Walker, N.T.  226, l. 20-25 and Defendant's Exhibits 45 and 46.)

224.    Herre Brothers, Inc. is claiming that its loss represents the difference between the sum of all of its Payment Applications, less the amount paid on it.

225.    No evidence was produced by the Government to prove the work performed by Herre Brothers, Inc. beyond Application No. 3 of the Plumbing Contract and Application No. 4 of the Electrical Contract had ever been approved by CRE's architects and engineers.

226.    There is no evidence that steel products incorporated into Application Nos. 2, 3, 4, 5, and 6 under the Plumbing Contract and Application Nos. 2,3, 4, 5, 6, 7, and 8 under the Electrical Contract were ever supported by the appropriate Buy America Act steel mill certificates.  (Defendant's Exhibits 34, 35, 36, and 37.)

227.    There is no evidence that Herre Brothers, Inc. had a contractual right to demand payment for the outstanding Payment Applications as the Government never introduced evidence that it had perfected its claim to receive payment for the Applications.

228.    There is no evidence that CRE, with the exception of the payment of Application Nos. 3 and 4 of the Plumbing Contract, ever received an advance on its loans from its lenders for the remaining outstanding plumbing and electrical Payment Applications.

229.    There is no evidence of what percentage of the alleged loss equals profits which would be incidental and speculative and for purposes of the MVRA are not recoverable.

230.    There is no evidence that Mr. Dodd did not use funds received from draws supported by Herre Brothers, Inc. Applications for payment of anything other than "eligible expenses" for new construction.

53

231.    Attorney's fees are not includable as a loss if they are not related to investigation cost as a consequence of Defendant's criminal conduct.  The Third Circuit has ruled that the term "property" in §3663A(b)(1), does not include consequential damages.  United States v. Simmonds, 235 F. 3d 826, 833 (3rd Cir. 2000).

232.    Despite Mr. McBride testifying that Mr. Dodd's failure to pay the outstanding $70,000.00 owed to his company resulted in the company going out of business, instead, Herre Brothers, Inc.'s own press release at the time related the failure of the business was the result of a down turn in the economy, losses on jobs, customers (plural) unable to pay their bills, and the company's inability to control its labor costs.  (McBride, N.T. 702, 13-25 and N.T. 703, l. 1-7.)

### (iv)    H. W. Nauman & Sons Claims

233.    H. W. Nauman & Sons, hereinafter referred to as "Nauman," entered into an Owner-Contractor Agreement with Cameron Real Estate to provide Work within the Project.  The Owner-Contractor Agreement incorporated by reference the terms and conditions of the documents identified in ¶1.1.2 of the Instruction to Bidders, the Contract Documents described in Paragraphs 1.1.2 of the Bidders Instructions and the project manuals. The Contract Documents included a the definition of Work and the regulatory requirements of the Federal and State governments concerning payment of prevailing wages (Davis-Bacon Predetermination) and the more stringent provisions of the Buy America Act and Steel Products Procurement Act.

234.    Nauman was paid for its Payment Application Nos. 1 and 2.

235.    Nauman claims its Payment Application No. 3 in the amount of

$26,462.00 was approved by Defendant's architects and engineers, used by CRE to support a distribution of loan proceeds to CRE pursuant to a draw application filed by CRE with the City on or about February 21, 2008.

236.    Nauman claims it was never paid for the Work represeted by Payment Application No. 3 pursuant to the direction of the Defendant.  As a result, Nauman claims it suffered a loss of $26,462.00 representing the retainage its contract together with three (3) additional change orders of: (1) $3,358.08 for storage trailers containing insulation; (2) $1,387.00 for rental of a seamer; and (3) $465.47 for insulation and patch tape.  The total loss claimed by Nauman equals $31,672.47.  (Government Exhibit 25).

237.    Payment Application No. 3 submitted by Nauman was its final application and was seeking payment of the ten percent (10%) retention.  (Dodd N.T. 366, L. 15–24.)  The Payment Application included an AIG Document G706 – Contractor's Affidavit of Payment of Debts and Claims.  (Defendant Exhibit 71.)  The Contractor's Affidavit of Payment of Debts was submitted to CRE pursuant to §9.10.2 of the General Conditions of the Contract. (Dodd N.T. 366, L. 25 and N.T. 367, L. 1–9; and Defendant Exhibit 2, page 41 and Defendant Exhibit 25.)

238.    The Affidavit Payment pursuant to §9.10.2(6) is a sworn statement affirming all debts owed to vendors related to its Work have been paid in full.  (Dodd N.T. 368, L. 2–19 and Defendant Exhibit 71.)

239.    The Contractor's Affidavit of Payment submitted to CRE was incorrectly completed.  (Dodd N.T. 367, L. 17–25.)  The Affidavit instead of representing all subcontractors had been paid, reflected a $502,771.00 exception as still due and owing to Varco

Pruden Buildings.  (Dodd N.T. 368, L. 20–25 and N.T. 369, L. 1–3; and Defendant Exhibit 71.)

240.    The terms of the Construction Contract provided that until an Affidavit is received by the Owner avowing all vendors and subcontractors had been paid in full, final payment under the Construction Contract was not owed.  (Defendant's Exhibit 25, §9.10.1 of the construction contract p. 41).  Nauman's Affidavit of Payment was never corrected by the time that funding was suspended and terminated by the Defendant's lending sources.

241.    The evidence supports a finding that CRE had the funds to pay the $26,462.00 and extra cost of $5,210.55 in its checking account at the time the Project was shut down.  (Dodd N.T. 369, L. 7–15.)

**(vi)    Ciesco**

242.    On August 8, 2007, Ciesco entered into a Purchase Order and Supplier Agreement with CRE to provide interior steel studding throughout the Building Project.  (Dodd N.T. 376, L. 9–21; and Defendant Exhibit 80.)  Ciesco claims it has suffered a loss in the amount of $118,218.11.

243.    Pursuant to the terms of the Purchase Order, Ciesco was placed on direct notice that the more stringent provisions of the Buy America Act or Steel Products Procurement Act contained in the Construction Contract (Defendant Exhibit 2) were made part of the Purchase Order and Supplier Agreement.

244.    Moreover, on September 24, 2007, Ciesco was placed on notice by Mr. Davis that steel mill certifications for all gauges of studding to be used throughout the Project needed to be obtained.  (Dodd N.T. 376, L. 22–25 and N.T. 377, L. 1–17; and Defendant Exhibit 81.)

245.    On September 25, 2007, a single steel certification for 20 gauge structural steel and tracks was forwarded by Ceisco and received by CRE.  (Dodd N.T. 377 L. 3-17) (Defendant Exhibit 81.)

246.    On May 5, 2008, Scott Davis emailed Frank Kruse, Ciesco, that CRE only had steel certifications for 20 gauge steel structural studs and tracks.  Mr. Davis indicated that steel certifications to cover 14, 16, and 18 gauge structural and non-structural studs and tracks were needed.  (Dodd N.T. 377 L. 18-25 and N.T. 378 L. 1-20, Defendant's Exhibit 82).

247.    Mr. Kruse responded that he would provide the steel certificates, that it would take a number of weeks, and asked when could he expect to be paid.  (Defendant Exhibit 82).

248.    There is no evidence that the steel certifications required under the Purchase Order and Supplier Agreement were ever provided to CRE by Ciesco.

249.    The funding for the Ciesco portion of the Construction Contract was suspended by CRE's lenders as the result of the actions of other contractors and no money was ever received by CRE.  (Dodd, N.T. 371.)

**(vii)    Schaedler / Yesco**

250.    On August 14, 2007, Schaedler/Yesco entered into an Owner-Contractor Agreement with Cameron Real Estate to provide switch gear equipment incorporated within the Project.  (Dodd N.T. 355, L. 1–13 and Defendant Exhibit 41.)  The Owner-Contractor Agreement incorporated by reference the terms and conditions of the documents identified in ¶1.1.2 of the Instruction to Bidders, the Contract Documents described in Paragraphs 1.1.2 of the

Bidders Instructions and the project manuals.

251.    On October 23, 2007, Schaedler/Yesco representatives attended the Pre-Construction Job Site Conference at which time they were advised no payments on their contracts would be made until CRE received Buy America steel mill certificates. (Defendant's Exhibit 1.)  The Contract Documents included a the definition of Work and the regulatory requirements of the Federal and State governments concerning payment of prevailing wages (Davis-Bacon Predetermination) and the more stringent provisions of the Buy America Act or Steel Products Procurement Act and the Buy America Act.  (Defendant's Exhibit 2, Paragraph 3.9 (a) and (c) page 0805 of the Regulatory Provisions of the Construction Contract.)

252.    On December 17, 2007, Scott Davis, CRE, forwarded an email to Pat Short of Schaedler/Yesco advising that steel certifications or, in the alternative, documentation that electrical components were exempt from certifications, were required pursuant to the Construction Contract.  (S. Davis N.T. 74, L. 1–23; and Defendant Exhibit 14.) Mr. Davis further advised Ms. Short that the steel mill certificates need for the Contract were missing and had not been provided. (S. Davis N.T. 74, L. 15–20; and Defendant Exhibit 14).

253.    On January 18, 2008, Tresa Mitzel forwarded an email to Mr. Davis claiming that Schaedler/Yesco had never received a project manual (expanded contract, Defendant Exhibit 2) and that steel certifications were being compiled and would be forwarded to CRE  when received by the various manufactures of the steel components being incorporated into Schaedler/Yesco's Work.  (S. Davis N.T. 75, L. 5–23; and Defendant Exhibit 15.)

254.    On February 6, 2008, Scott Davis emailed Ms. Mitzel and again emphasized that all supporting paperwork must meet the regulatory provisions of the

58

Construction Contract in order for CRE to process Payment Applications and such Payment Applications would be rejected if not supported by the proper steel certifications. (S. Davis N.T. 75, L. 24–25 and N.T. 76, L. 1–21; and Defendant Exhibit 16).

255.    On February 28, 2008, Scott Davis again wrote to Ms. Mitzel regarding the necessity of having proper steel certificates to the Payment Applications. (S. Davis N.T. 76, L. 22–25 and N.T. 77, L. 1–19; and Defendant Exhibit 17.) On February 28, 2008, Ms. Mitzel responded to Mr. Davis, advising that Pat Short was working on obtaining the steel mill certifications required to be submitted with the payment applications. (Dodd N.T. 34, L. 9–25 and N.T. 35, L. 1–5; and Defendant Exhibit 69.)

256.    On May 13, 2008, Pat Short, Schaedler/Yesco, wrote to Scott Davis concerning the status of steel certifications and for the first time advised CRE steel certifications would **not** be provided, stating that "steel certifications not available" were clearly marked on the quotes given to CRE. (Dodd N.T. 357, L. 9–25 and N.T. 358, L. 1–6; and Defendant Exhibit 44.) Ms. Short, however, advised she was providing a "ST-3 75% U.S. Manufacture Certification" steel certification from Powercom, a voltage switch gear manufacture. Ms. Short also advised "there will be no further certifications submitted on this project" (Defendant Exhibit 44).

257.    The certification submitted by Ms. Short from Powercom indicated that only 90% of the steel incorporated into the voltage switch gear had its origin and was milled in the United States. Also received, contained in the same email, but not mentioned by Ms. Short, was a certification complied by Siemens Energy and Automation which had been received by Schaedler/Yesco in May of 2008 but only indicated that 90% of the product manufactured by

Siemens contained steel which had its origin or was manufactured in the United States.  The
Siemens steel certification was not signed by an officer of Siemens as required by the controlling
statutes, but, instead, was signed by the plant controller and purchasing manager.  (Dodd N.T.
358, L. 9-25; and Defendant Exhibit 44.)

258.    On May 16, 2008, in an effort to secure payment of
Schaedler/Yesco's Payment Application, Mr. Dodd wrote to Kathy Possinger, Deputy Director
for Housing, City of Harrisburg, who was responsible for oversight and management of the
City's Section 108 program (Possinger N.T. 165, L. 20-25 and N.T. 166 1-8) asking whether
state DGS "ST-3" (75% domestic steel) and DGS "ST-2" (non-identifiable/non-structural steel)
forms would be acceptable to satisfy the Buy America Act regulatory provisions of the
Construction Contract.  (Defendant's Exhibit 18.)

259.    On May 16, 2008, Ms. Possinger, a person intimately familiar with
HUD regulations, as characterized by the government (Possinger N.T. 166, l. 9-13), wrote to the
Defendant indicating that she was researching whether the state forms provided by
Schaedler/Yesco would satisfy the federal Buy America Act requirements of the Contract
(Defendant's Exhibit 18).

260.    Schaedler/Yesco never proved it met the conditions precedent to
receive payment for its Work under the Contract.  On May 13, 2008, despite having advised CRE
for six months it was attempting to compile steel certifications, Schaedler/Yesco took a contrary
position.  At that point, Schaedler/Yesco stated it was not required to produce such certifications
and would not be providing any steel certifications other than the incomplete steel certifications
attached to its correspondence of May 13, 2008.  (Dodd, N.T. 357, l. 9-25 and N.T. 358, l. 1-25

and Defendant Exhibit 44).  The evidence supports a finding that Schaedler/Yesco never complied with the regulatory terms and conditions of the Construction Contract and thus never had a right to receive payment for its Work as its Work was non-compliant.

261.    The certifications submitted by Schaedler/Yesco were not properly completed, did they meet the federal 100% steel certification for milling in the United States; and in the end refused to provide steel mill certificates.  (Dodd, N.T. 358, l. 3-25 and N.T. 359, l. 1-13.)

262.    Schaedler/Yesco claims it is owed $390,767.05 which consists of its Payment Application No. 1 in the amount of $319,203.00 together with retainage and change orders.  CRE had included Schaedler/Yesco Application No. 1 in the amount of $319,203.00 to support its draw request pursuant to the City Loan Agreement.  CRE, however, never received any loan proceeds from the City based upon Schaedler/Yesco's Payment Application No. 1.  (S. Davis N.T. 147, l. 12-24 and Dodd, N.T. 359, l. 18-22.)

263.    The evidence also supports a finding that CRE never received any loan proceeds under its City Loan Agreement as a result of Schaedler/Yesco's Payment Application No. 1.  (Dodd, N.T. 359, l. 18-22.)

264.    Schaedler/Yesco's payment had  been processed by the City but distribution of funds by the City to CRE was suspended on or about May 8, 2008 due to other contractors having filed mechanic's lien claims against the Project.  (Possinger N.T. 176, L. 11–15 and N.T. 178, L. 1–12; and Government Exhibit 32.)

265.    Defendant never exercised any dominion or control over the alleged property of Schaedler/Yesco and therefore could not have improperly usurped or

misappropriated such property.

### (viii)    Weaver's Glass & Building Specialties, Inc.

266.    On October 22, 2007, Weaver's Glass and Building Specialties, Inc. (hereinafter referred to as "Weaver") entered into an Owner-Contractor Agreement with Cameron Real Estate to provide curtain walls and windows Work within the Project.  The total amount of the contract equaled $1,066,975.00.  (Defendant's Exhibit 72.)  The Owner-Contractor Agreement incorporated by reference the terms and conditions of the documents identified in ¶1.1.2 of the Instruction to Bidders, the Contract Documents described in Paragraphs 1.1.2 of the Bidders Instructions and the project manuals.  The Contract Documents included a the definition of Work and the regulatory requirements of the Federal and State governments concerning payment of prevailing wages (Davis-Bacon Predetermination) and the more stringent provision of the Buy America Act or Steel Products Procurement Act.

267.    Weaver's submitted three (3) Applications for Payment from March 10, 2008 through May 8, 2008 in the total amount of $594,890.00.  (Stipulation of Parties.)

268.    On March 26, 2008, Mr. Davis, CRE, wrote to Mr. Kreiser, Weaver's, regarding Application No. 1.  Mr. Davis' correspondence indicated that the Application for Payment had to be supported by documentation outlined in the Regulatory provisions of the Contract (Defendant Exhibit 73).

269.    During Weaver's performance of its Work, there also arose discrepancies in wage certifications that had been submitted by Weaver's.  Specifically, during the week ending March 1, 2008, an issue with regard to the wage of an employee was questioned.

(Defendant's Exhibit 40, top of page 3).

270.    On May 21, 2008, the dispute was noted as being still outstanding. (Defendant's Exhibit 40, top of page 3.)

271.    Ms. Lark in her report of June 2, 2008, noted that wage certification issues was still unresolved.  (Defendant Exhibit 31.)

272.    Ms. Lark also reported on June 20, 2008 that payrolls issued by Weaver's on the week ending on April 12, 2008)  contained errors and the errors needed to be addressed.

273.    Mr. Dodd also observed that during Weaver's prosecution of its Work, steel was being incorporated into its Work.  (Dodd N.T. 370 L. 4-16.)  Specifically, the calculations for the curtain walls reflected that steel angle iron was being used to secure glass panels into the curtain wall (Dodd N.T. 370 L. 10-25 and N.T. 371 L 1-25) Defendant Exhibit 74).  Pictures of the curtain wall also clearly show steel angle iron in place supporting the curtain wall as depicted in the take offs and calculations for the curtain walls. (Dodd N.T. 372  L. 17-25 and N.T. 373 L. 1-19 and Defendant Exhibit 74.)

274.    Weavers never provided any steel mill certificates to CRE.  (Dodd N.T. 373 L. 20-25 and N.T. 374 L. 1-3).

275.    The ultimate responsibility for obtaining steel and wage certifications were CRE's obligation (Defendant Exhibits 45 and 46; and Walker, N.T. 221-224). Defendant testified that he was receiving oral and written directions from City Administrators not to pay contractors who had not provided steel mill certifications.  Ms. Lark had identified that outstanding wage certificate issues should also be resolved and it was within the prerogative of

the owner to withhold payment.

276.    Weaver's representative disputed that any steel was being used in the curtain wall assembly claiming the fasteners were made of aluminum.  (Dodd N.T. 373 L. 20-25 and N.T. 374 L. 1-3.)  The issue of obtaining steel certification was never resolved by the time Weaver's had submitted Payment Application No. 3 for payment in May of 2008.  No steel certification were ever submitted by Weaver's to support any of their Payment Applications (Dodd N.T. 373, l. 20-22).

277.    CRE took the position that the Owner could not utilized Weaver's Payment Application for its Work to support a draw request until the steel mill certifications were received and the wage certification issues were resolved.  CRE took this position pursuant to Paragraphs 9.5, §9.5.1 of the General Contract Conditions and Paragraph 3.9(A) and (C), page 0805-7 of the Regulatory Provisions of the Construction Contract.

278.    The contractual provisions specifically provided that no payment was to be made to a contractor who did not provide steel mill certificates which met the more stringent provisions of the Steel Products Procurement Act or the Buy America Act.

279.    There is no evidence that any of the Payment Applications were ever approved by the CRE's architects and engineers.  There is no evidence that CRE submitted loan draw applications based upon any of Weaver's Payment Applications to its lenders.

280.    There is no evidence that CRE ever received any money from any of its lenders to pay for Work performed by Weaver's or that Defendant specially withheld money from Weaver's for Work it had performed.  (Dodd N.T. 376 L. 5-8.)

281.    Weaver's also claims its incurred $47,561.29 in attorney's fees in

attempts to collect the obligation it alleges CRE owes to it for Work of the Project.  There is no evidence itemizing the attorney's hourly rate, the hours billed, or whether the fees were ever paid.  The record is silent as to whether the attorney's fees were related to an investigation and/or prosecution of Mr. Dodd. (Stipulation of Claims).

282.    No evidence was produced by the Government to prove the Work performed by Weaver's as represented by Application Nos. 1, 2, and 3 had been approved by CRE's  engineers and architects.

283.    There is no evidence that the steel products incorporated into the Work represented by Application Nos. 1, 2, and 3 were or could be supported by the proper steel mill certificates.

284.    There is no evidence that the Davis-Bacon wage certifications were ever resolved.

285.    There is no evidence in the record as to what percentage of the alleged loss equaled profits, and as a result, and award for such loss would be speculative  which for purposes of the MVRA are not recoverable.

**(ix)    Macri Concrete, Inc.**

286.    On July 6, 2007, Macri Concrete, Inc. (hereinafter referred to as "Macri") entered into an Owner-Contractor Agreement with Cameron Real Estate to provide CIP concrete slab and topping Work within the Project.  (Defendant's Exhibit 83).  The Owner-Contractor Agreement incorporated by reference the terms and conditions of the documents identified in ¶1.1.2 of the Instruction to Bidders, the Contract Documents described in Paragraphs 1.1.2 of the Bidders Instructions and the project manuals.  The Contract Documents

included a the definition of Work and the regulatory requirements of the Federal and State governments concerning payment of prevailing wages (Davis-Bacon Predetermination) and the more stringent provisions of the Buy America Act or the Steel Products Procurement Act.

287.    Macri entered into an Owner-Contractor Agreement for the CIP concrete work and was to be paid $1,214,022.00 for its CIP concrete slab and topping Work. (Defendant's Exhibit 83).

288.    Macari submitted seven (7) Applications for Payment.

289.    Macri claims its Application Nos. 5, 6, and 7 in the amount of $323,058.00, submitted in February, March, and April of 2008 remain unpaid.  (Stipulation of Claims).

290.    During the prosecution of its Work, there developed a problem with the concrete Macri had used on the site.  The concrete supplied to Macri by a vendor was not consistent with the specifications of the contract.  The issue of the strength of the concrete began on February 12, 2008 and was still an open issue on May 6, 2008.  (See, Defendant Exhibit 85, page 3, paragraph 8 concrete mix.)

291.    There is an issue with regard to Macri's failure to provide of steel certifications for wire mesh used in the reinforcement of the concrete.  The steel certifications provided by Macri failed to identify the origin of the steel and were not executed by an officer of the fabricator of the wire mesh as required by law. (Dodd N.T. 380 L. 3-25 and N.T. 381 L. 1-81, Defendant Exhibit 84).  This issue was still outstanding at the time that the funding was terminated by CRE's lenders.

292.    The lenders' termination of funding had absolutely nothing to do

66

with Mr. Dodd having a conflict of interest in IDC, Inc., which had performed its contract and had not been paid for months.

293.    Any losses incurred by Macri Concrete resulted from the Project collapsing due to the actions of several contractors, which resulted in the State, City, County, and Metro Bank suspending and eventually terminating financing for the Project and resulted in CRE's inability to pay other contractors.

294.    This collapse had absolutely nothing to do with the conflict of interest scheme or other related criminal acts for which Mr. Dodd had been charged.

295.    Rather, the collapse was caused as the result of seasoned and sophisticated contractors who understood the regulatory requirements for wage and steel certifications in federal and state funded projects failed to provide to CRE the certificates required by the regulatory provisions of the Contract.

296.    In short, the real cause of Macri's loss had nothing to do with Mr. Dodd's criminal conduct or is so far attenuated in a factual basis as not to be a substantial factor for Macri's loss.  Macri is simply not a victim as a victim is defined under the MVRA.

297.    Macri claims that its loss is represented by Payment Application Nos. 5, 6, and 7 which were not paid.

298.    There is no evidence that Application Nos. 5, 6, and 7  had ever been approved by CRE's engineers and architects.

299.    There is no evidence as concerns the steel products which were incorporated in Application Nos. 5, 6, and 7 were supported by the proper steel mill certificates.

300.    There is no evidence as to what percentage of the alleged loss

equals profits, which loss would be incidental and speculative and for purposes of the MVRA not recoverable.

301.    Dodd never utilized Macri's Payment Application Nos. 5, 6, and 7 to support a draw request from a loan.

302.    There is no evidence that Macri was directly and proximately injured in the sense of losing its property as the result of Defendant's criminal conduct or directly harmed as the result of Defendant's conduct in the course of conducting his scheme.  There is no evidence CRE ever received any loan funds based upon Macri's Payment Application Nos. 4, 5, and 6.  For all those reasons, Macri has not suffered a loss as that term is defined under the MVRA.

### (x)    Commerce/Metro Bank

303.    Metro Bank provided both construction and permanent financing for the project.

304.    The construction permanent financing was secured by a first mortgage on the project property and personal guaranties of Mr. Dodd.

305.    Draws on the construction loan were made by CRE filing a request for a draw.

306.    The request for draws in some cases were not supported by any explanation while others contained an explanation.

307.    CRE made a request for $300,000.00 from the construction loan to pay an outstanding obligation owed to IDC.

308.    At the time the request had been made to Metro Bank, IDC,  was

owed $800,000.00 it had transferred to CRE in June of 2007 for potential repairs and adjustments to its work.  (Dodd, N.T. 519, l. 22-25 and N.T. 518, 1-25.)

309.    CRE, at the time it made the $300,000.00 request, owed IDC $800,000.00.

310.    CRE received the $300,000.00 from the Metro Bank line of credit, however, CRE did not pay IDC any amount but instead used the $300,000.00 to pay other eligible vendors.  (Dodd, N.T. 520, l. 7-25 and N.T. 521, l. 1-15.)

311.    There is no evidence that Metro Bank terminated the construction loan due to an event of default on the part of CRE or Mr. Dodd.

312.    The evidence supports the finding that Metro Bank suspended its financing after it received notice that certain contractors had filed mechanics' liens.

313.    There is no evidence that Metro Bank terminated its funding of the project due to Mr. Dodd having an interest in IDC or as the result of his criminal conduct.

314.    There is no evidence that Metro Bank has foreclosed on its mortgage.

315.    The evidence supports a finding that Metro Bank has lent to CRE the total sum of $6,500,000.00.  (Stipulation of Claims).

316.    The balance of Metro Bank's claim consists of interest and security costs.  (Stipulation of Claims).

317.    There is no evidence that Metro Bank ever foreclosed on its mortgage.

318.    There is no evidence as to the value of the land and the structure

69

build upon the land secured by Metro Bank's mortgage.

(xi)   **Dauphin County and The City of Harrisburg**.

319.   CRE and Advanced Communications entered into loan agreements with both the County of Dauphin and The City of Harrisburg (Defendant's Exhibit 55 and 56). The loan agreements were secured by second mortgages on the project property.

320.   There is no evidence that either Dauphin County or The City of Harrisburg have foreclosed on their mortgages.

321.   There is no evidence as to the value of the property on which the project is built.

322.   The City of Harrisburg only advanced $1,572,845.23 of Section 108 funds to CRE pursuant to the loan agreement.  (Defendant's Exhibit 77 and Government Exhibit 32).

323.   BDI and EDF funds were grants and not loans.  (B. Davis N.T. 129 L. 2-5).

324.   City of Harrisburg only has to repay the Section 108 loan funds and such funds are taken out fo future Block Grant Allocations.  (B. Davis N.T. 128 L. 9-10).

325.   The County of Dauphin advanced $2,752,450.64 in Section 108 funds to CRE.

326.   The claim of The City of Harrisburg in the amount of $6,162,255.62 includes costs other than the actual amount of the monies lent to Advanced Communications.  The claim of The City of Harrisburg is based upon an interest component as if the loan was amortized and paid over a period of thirty (30) years for a total amount of

$6,162,255.62 not recognizing the principal lent to Advanced only equaled $1,572,845.23. Further, the City will not lose $6,162,255.62 in future allocations of Section 108 Funds but only the amount not repaid to HUD.

327.    All of the amounts lent by The City of Harrisburg and Dauphin County to Advanced Communication and CRE between January 23, 2008 and June 19, 2008 were used exclusively to pay eligible costs of the project pursuant to 24 C.F.R. §570.203.  (Dodd, N.T. 389, l. 3-25 and N.T. 390, l. 1-25 and Defendant's Exhibit 79.)

328.    All of the amounts borrowed from The City of Harrisburg and Dauphin County pursuant to Section 108 CDDG Program were spent for eligible expenses for new construction work incorporated into the project.  (Connor N.T. 122 L. 16-25 and N.T. 123 L. 1-7).

329.    The evidence does not support a finding that the project collapsed as the result Mr. Dodd's interest in IDC or the payment of IDC's eligible expenses.

330.    The evidence supports a finding that the funding by The City of Harrisburg and Dauphin County was suspended as a result of certain contractors filing mechanics' lien claims and Mr. Dodd's refusal to pay contractors.

331.    There is evidence that Mr. Dodd had access to $820,000.00 at the beginning of May 2008 and had the ability  to pay in full the claims of the contractors who filed mechanics' lien claims in May 2008.  (Dodd, N.T. 495, l. 10-23.)

332.    The evidence reflects that the contractors were not paid by Mr. Dodd as a result of his administration of the contract and the directives of the HUD administrator and others and not as a result of his interest in IDC or as the result of the other conducts set forth

in the indictment.  At the time of the funding the project was terminated 80% of the project was complete.  (Defendant's Exhibit 85, Job Conference Report dated May 6, 2008, page 9).

333.    The 10% retainage of the construction contracts for each of the contractors would have been insufficient to pay for the removal and replacement and steel products incorporated into their work.

334.    Defendant Dodd had been admonished by the contract administrator for The City of Harrisburg that he should not pay contractors who had failed to provide by America Steel Mill Certificates for steel incorporated into their work.

335.    There is no evidence that federal regulations regarding the expenditure of Section 108 funds were required to mirror payment applications upon which Mr. Dodd had submitted for payment.

336.    There is no evidence that the Construction Contract required CRE or Mr. Dodd to pay contractors progress payments which mirrored their payment applications.

337.    There is no evidence that the Construction Contract required CRE or Mr. Dodd to segregate or earmark draws received from either The City of Harrisburg or Dauphin County to the contractors whose payments applications had been used to secure the draw.

338.    There is no evidence that federal or state law requires a person receiving Section 108 CDDG funds is required to pay draws solely to those contractors whose payment applications have been used to support a draw request.

339.    The Notice of Default given by The City of Harrisburg to Mr. Dodd regarding its suspension of funding of the project did not mention that suspension was due

to his failure to pay certain contractors, but, instead, it was taking such action as the result of the filing of mechanics' liens claim.  (Government Exhibit 34.)

340.    CRE's counsel forwarded notice to both H&R Mechanical, Inc.'s counsel and Herre Brothers, Inc.'s counsel that their filing of mechanics' lien claims were in violation of the terms and conditions of the Construction Contract and demanded retraction of the claims.  (Defendant's Exhibit 8).

341.    The Construction Contract provides that in the event a contractor was to file a mechanics' lien claim that it would withdraw the claim upon an owner's request.

342.    Neither H&R Mechanical, Inc. nor Herre Brothers, Inc. withdrew their mechanics' lien claims.

343.    Defendant Dodd wrote to his attorney in February 2008 about his financial concerns regarding the project, but subsequent to the expression of his concerns, continued to pay contractors and vendors through the end of April 2008 as funds were released to him.  (Dodd, N.T. 447.)

## DEFENDANT'S PROPOSED CONCLUSIONS OF LAW

1.     Under the MVRA, a federal sentencing court "shall order" restitution for certain offenses but only if the court finds that "an identifiable victim or victims have suffered a physical injury or pecuniary loss" as a "direct and proximate" result of the offense.  §§3663A(a)(2), (c)(1)(B).

2.     The definition of a "victim" pursuant to the MVRA is:

> (a)(2)  ...the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense the involves a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. §3663A(a)(2).

3.      The "offense" that defines statutory victim status under the MVRA must be the offense of conviction.  United States v. Akande, 200 F. 3d 136, 141-142 (3rd Cir. 1999).

4.     Under the MVRA, restitution is allowable "only for the loss caused by the specific conduct that is the basis for the offense of conviction."  Hughey v. United States, 495 U.S. 411, 420 110 S.Ct. 1979 (1990); see also, United States v. Akande, 200 F. 3d 136, 138 (3rd Cir. 1999) ("the conduct underlying the offense of conviction...stakes out the boundaries of the restitution area authority.")

5.     Under the MVRA, a federal sentencing court is further restricted in that it  "shall order" restitution but only if the court finds that an identifiable victim or victims have suffered a property loss as a direct and proximate result of the offense.  §§3663A(a)(2), (c)(1)(B).  18 U.S.C. §3663A provides restitution may be ordered to persons other than victims

of the offense of conviction "if agreed to by the parties in a plea agreement."  See, United States v. Lynch, 345 Fed. Appx. 798, 803, 2009 U.S. App. Lexis 20587, 13 (3rd Cir. 2009).

6.      Persons other than victims, like victims, must prove their loss was directly and proximately caused by a defendant's specific conduct that is the basis for the criminal offense or the defendant's criminal conduct.  18 U.S.C. §3663A(a)(3) and (c)(1)–(3).

7.      Under the MVRA that "restitution must be...'based upon losses directly resulting from [the defendant's criminal] conduct.'"  Id. at 548, citing U.S. v. Quillen, 335 F. 3d 219, 222 (3rd Cir. 2003).

8.      The harm to the victim must be closely related to the conduct, rather than tangentially linked.  United States v. Kones, 77 F. 3d 66, 70 (3rd Cir. 1996).

9.      The Third Circuit Court of Appeals has interpreted the term "victim" and concluded it did not include a person who has experienced no harm arising from the criminal conduct that gives rise to the offense of conviction.  United States v. Kones, 77 F. 3d 66 (3rd Cir. 1996)  The Third Circuit held:

> [I]n order for restitution to be permissible, the harm must "directly" result from the "criminal conduct" of the defendant.  In this context, we interpret "direct" to require that the harm to the victim be closely related to the scheme, rather than tangentially linked.
>
> The conduct that [she] alleges caused her harm is not conduct proscribed by the mail fraud statute.  The conduct proscribed by the mail fraud statue is the use of the mails for the purpose of executing a scheme to defraud....[Patient] does not allege that she was injured by the submission of the insurance claims.  She alleges that she was injured by faulty medical services. ...is not conduct proscribed by the mail fraud statue.

10.      Restitution under the MVRA are limited to remedying the actual

75

loss caused by the defendant's "offense conviction."  Hughey v. United States, 495 U.S. 411, 413, 110 S. Ct. 179 (1990) cited in Singh v. Attorney General of the United States, 677 F. 3d 503, 512-13 (3rd Cir. 2012).

        11.    The terms "directly and proximately harmed," as used in the MVRA is a manner of expressing causation.  United States v. Fallon, 470 F. 3d 542 (3rd Cir. 2005).

        12.    The test of causation (direct and proximate) under the MVRA is as follows:

> By the statute's explicit terms, loss can only be paid to victims who are "directly and proximately harmed."

        13.    Under the MVRA, "restitution must be ...'based on *losses directly resulting* from [the defendant's criminal] conduct".... the following two-prong test:

> First:  Restitution should not be ordered in respect to a loss which would have occurred regardless of the defendant's conduct....

> Second:  Even if but for causation is acceptable in theory, limitless but for causation is not.  Restitution should not lie if the conduct underlying the offense of conviction is too far removed, either factually or temporally, from the loss.

        14.    The government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated (either factually or temporally).

        15.    Under the MVRA that "restitution must be...'based upon losses directly resulting from [the defendant's criminal] conduct.'"  United States v. Fallon, 470 F. 3d

542 (3rd Cir. 2005) citing U.S. v. Quillen, 335 F. 3d 219, 222 (3rd Cir. 2003).

       16.     The Plea Agreement executed in this matter specifically acknowledges the provisions of the Mandatory Victims Restitution Act of 1996 ("MVRA").

       17.     The Plea Agreement provides Defendant's conduct includes conduct underlying the charges of conviction as well as all other charges dismissed as part of the Plea Agreement.

       18.     The Plea Agreement states that restitution could be ordered to persons other than "victims" of the specific offense of conviction.  However, the Plea Agreement conditioned and qualified such relief.

       19.     The Plea Agreement states if the Defendant and the United States cannot reach an agreement either to (1) amount of loss involved; or (2) the amount of restitution owed by the Defendant or both then the United States would be required to prove the amount of the loss involved and the amount of restitution owed at an appropriate hearing before the district court. (¶10A of the Plea Agreement.)

       20.     The terms of the Plea Agreement do not specifically identify any "victim;" the amount of any "loss"; or any amount of restitution to be paid to a "victim."

       21.     Plea agreements are in effect contracts, the result of bilateral bargaining, and are to be interpreted under principles of contract law.  See, United States v. Williams, 102 F. 3d 923, 926-927 (7th Cir. 1996).  Like any other contract, there must be a meeting of minds on all essential terms in order for a plea agreement to be valid.  United States v. Rundle, 324 F. 3d 550 (7th Cir. 2003) citing United States v. Barnes, 83 F. 3d 394, 978 (7th Cir. 1996).       22.     The Plea Agreement also does not express an

understanding that Mr. Dodd agreed that any of the contractors, Metro Bank, or local agencies were "victims" or suffered any "loss" as a result of his criminal act or conduct.

23.     References in the Plea Agreement to Defendant making full restitution in accordance with a schedule to be determined by the Court is not an expression of Mr. Dodd's agreement that there was a "loss" or he owed restitution to a "victim" or other persons.  The provision only related to those individuals whom Defendant and the United States agree upon being a "victim" pursuant to the MVRA and as to the amount of those "victims'" property loss.

24.     The meaning of the Plea Agreement is unambiguous.  In the event the United States and the Defendant did not reach an agreement as to either the amount of "loss" involved and the restitution owed, then by implication, the United States, pursuant to the MVRA, must prove by a preponderance of the evidence to the Court the following:  (1) a person is a "victim"; (2) that the "victim" suffered a property "loss"; (3) the amount of the "loss" of the "victim"; (4) persons other than "victims" and how those persons suffered a property loss recognized by the MVRA as the result of Defendant's conduct; and (5) the amount of restitution, if any.

25.     This Court, without doing offense to the Plea Agreement, is not in a position in this sentencing setting to enter Orders of Restitution under the MVR.  The facts developed to date are complex and causation of the damages alleged are unclear and not clearly directly and proximately related to the Defendant's offense conviction or his conduct as identified in the two (2) indictments.  The issues being sought to be resolved in this MVRA hearing can be better addressed in the United States Bankruptcy Court of the Court of Common

Pleas of Dauphin County.

             26.            As the Third Circuit in the <u>Kones</u> case observed with regard

to a District Court declining an order of restitution:

> We understand this provision to call for a weighing of the
> burden of adjudication the restitution issue against the desirability
> of immediate restitution–or otherwise stated, a weighing of the
> burden that would be imposed on the court by adjudicating
> restitution in the criminal case against the burden that would be
> imposed on the victim by leaving him or her to other available
> legal remedies.

> Nothing in the legislative history evidences an expectation
> that a sentencing judge would adjudicate, in the course of the
> court's sentencing proceeding, <u>all civil claims against a criminal</u>
> <u>defendant arising from conduct related to the offense</u>.  Rather, it
> was expected that entitlement to restitution could be readily
> determined by the sentencing judge based upon the evidence he
> had heard during the trial of the criminal case or learned in the
> course of determining whether to accept a plea and what an
> appropriate sentence would be.  While the original statute, similar
> to the current version, provided for discretion to decline to grant
> restitution when it would be an undue burden to do so, this was not
> because Congress expected that sentencing judges would be
> required to hold an evidentiary hearing on liability issues in the
> course of the sentencing proceedings.  As the Senate Report
> explains, "the Committee added this provision to prevent
> sentencing hearings from becoming prolonged and complicated
> trials on the question of damages owed the victim."  S. Rep. No.
> 532, 97th Cong., 2d Sess. 31 (1982), reprinted in 1982
> U.S.C.C.A.N. 2515, 2537 (emphasis added).  The kind of case that
> Congress had in mind was one in which liability is clear from the
> information provided by the government and the defendant and all
> the sentencing court has to do is calculate damages.  See <u>id.</u> at
> 2536-37 (discussing a case where the victim of a purse snatching
> suffered a broken hip).  (Emphasis provided.)

> This aspect of Congress' expectation is important because
> it counsels against construing the text of the statute in a way that
> would bring fault and causation issues before the sentencing court
> that cannot be resolved with the information otherwise generated in

the course of the criminal proceedings on the indictment. We are
persuaded that this counsel should guide our interpretation of the
restitution provisions of the VWPA.

Kones, 77 F. 3d at 68-69 (emphasis in original).

In determining to affirm the district court's decision, the Kones Court ruled:

as the facts of this case illustrate, to hold otherwise would unduly
burden sentencing courts. No information developed in the course
of these proceedings provided the district court with a basis for
adjudicating whether [defendant's] treatment of [claimant] was
legal or illegal, was consistent or inconsistent with medical
standards prevailing in the community, or was or was not causally
related to the injuries she allegedly suffered. As the district court
aptly observed, it could not grant [claimant's] restitution request
without fully litigating a tangentially related medical malpractice
case as a part of the sentencing process.

Kones, Id. at 71.

The Conference Committee report in explaining the 1996 enactment of the MVRA,

explained the test of causation under the Act as follows:

The committee intends this provision to mean, except
where a conviction is obtained by a plea bargain, that mandatory
restitution provisions apply only in those instances where a named,
identifiable victim suffers a physical injury or pecuniary loss
directly and proximately caused by the course of conduct under the
count or counts for which the offender is convicted.

S. REP. NO. 104-179, at 19 (1996), 1996 U.S.C.C.A.N. 924, 932.
That Report emphasized:

In all cases, it is the committee's intent that highly complex
issues related to the cause or amount of a victim's loss not be
resolved under the provisions of mandatory restitution. The
committee believes that losses in which the amount of the victim's
losses are speculative, or in which the victim's loss is not clearly
causally linked to the offense, should not be subject to mandatory

restitution.

27.     Each of the contractors' right to receive a progress payment was conditioned upon its having provided to the Owner both Buy America Act steel mill certificates and Davis-Bacon wage certificates.

28.     The Construction Contract provided that in the event that a contractor did not provide steel mill certificates reflecting the origin and milling of the steel to be 100% completed in the United States or failed to produce Davis-Bacon wage certificates, the Owner had a right not to pay the progress payment.

29.     If the Davis-Bacon wage certificate and Buy America Act steel mill certificates provisions of the Construction Contract were not complied with by the contractors, the City of Harrisburg and the County of Dauphin, on behalf of HUD, could seek reimbursement for the cost of the Work from the Owner for which such certificates were not secured.

30.     The contractors by not having secured the proper steel mill certificates and in some cases, Davis-Bacon wage certifications, had not perfected their claims for progress payments.

31.     The contractors, not having perfected their contract interest in receiving the progress payment, did not have any property or property interest to lose under MVRA.

32.     The contractors' losses are not the direct and proximate cause of the Defendant's specific offense conduct or the conduct referred to in the two (2) indictments.

33.     Projects which are privately owned but built for a public purpose

have been defined by the Pennsylvania appellate courts to be properties built for a public

purpose.  Carter-Jones Lumber Co. v. Northwester Pa. Humane Society, __ Pa. Cmnwlth. __,

913 A.2d 1002 (2006).

      34.    The Pennsylvania Mechanics Lien Act, as amended, provides an

exemption for properties built for a public purpose.  49 P.S. §1303(b).

      35.    The 2007 amendments to the Pennsylvania Mechanics Lien Act did

not change the exemption for public purposes provisions found at 49 P.S. §1303(b).  Cornerstone

Land Development Co. of Pittsburgh LLC v. Wadwell Group, __ Pa. Super. __, 959 A.2d 1264

(2008).

      36.    All of the contractors acknowledged by the terms of the

Construction Contract that the Project was a Public Work.

      37.    The Project was certified by Dauphin County as a Project that met

the social and public needs of Dauphin County.

      38.    The claimants, Herre Brothers, Inc., H&R Mechanical, and Joseph

Stong, Inc., filed mechanics liens contrary to the terms and conditions of the Construction

Contract and failed to remove the same after being asked to do so by CRE.

      39.    The ten percent (10%) retainage provided for by the terms of the

Construction Contract would not be sufficient to remove and replace all of the non-certified steel

incorporated by the contractors into their Work.

      40.    The term "property" as set forth in §3663(b)(1) (VWPA), does not

include consequential or incidental damages.  See, Government of the Virgin Island v. Davis, 31

D.I. 332, 43rd F. 3d 41 (3rd Cir. 1994).

41.    Consequential damages, such as attorney's fees, are not recoverable as restitution under §3663(b)(1) of the VWPA.  <u>Davis</u>, Id. at 46, cited by <u>United States v. Simmonds</u>, 235 F. 3d 826, 833 (3rd Cir. 2000).

42.    The language of §3663(b)(1) (the VWPA) and §3663A(b)(1) (the MVRA) is identical in all relevant respects.  Therefore, absent a unique and highly persuasive MVRA legislative history, of which there is none.

43.    The Third Circuit Court of Appeals has interpreted the language of the §3663(b)(1) (the VWPA) control the interpretation of §3663A(b)(1) in this case.  See, <u>United States v. Simmonds</u>, 235 F. 3d 826, 831 (n. 2) (3rd Cir. 2000).  In <u>Simmonds</u>, the Third Circuit ruled that counsel fees, being a consequential loss, is not recoverable under the MVRA.  <u>Id.</u> at 833.

44.    Damages under the MVRA are limited solely to actual damages incurred by a victim.

45.    The contractors' claims for attorney's fees are incidental or consequential damages not recognized as a item of loss for restitution purposes under MVRA.

46.    The amortized interest claimed by the City of Harrisburg is an incidental and consequential damage and not an actual damage under the MVRA and thus is not collectible.

47.    The damages for security and future interest by Metro Bank is an incidental and consequential damage and are not items of restitution under MVRA.

48.    Defendant used all Section 108 funds to pay eligible expenses under 24 C.F.R. §507.203 and under the City and County loan agreements.

49.    There is no evidence that monies received under the Section 108 Program were paid for other than eligible expenses.

50.    The losses and harm alleged by Metro Bank, County of Dauphin, and the City of Harrisburg are represented by the monies which were paid to complete 80% of the structure which now sits on the site.

51.    There is no evidence that any of the monies from Metro Bank or the County of Dauphin and City of Harrisburg were used for any other purpose other than to construct the Project.

52.    The government, under the provisions of the MVRA, has failed to prove by a preponderance of the evidence that the losses claimed by the contractors, Metro Bank, County of Dauphin, and City of Harrisburg were the direct and proximate result of Defendant's specific criminal offense or of any of the conduct for which he was indicted.

53.    To award the contractors claims, as well as those of Metro Bank, Dauphin County and the City of Harrisburg, would represent a double recovery of the loss.

54.    There is no evidence as to the value of the land and structure as of this date.

55.    To enter an order of restitution without Metro Bank, County of Dauphin, and City of Harrisburg to perfect their security interest in the Property by foreclosing on their mortgages would be speculative.

56.    There is no legal ground or justification based upon the present state of this case to enter an award of restitution to any of the contractors, Metro Bank, County of Dauphin, or the City of Harrisburg under the provisions of the MVRA.

84

Respectfully submitted,

CUNNINGHAM & CHERNICOFF, P.C.


Date: <u>June 25, 2013</u>          By:      <u>/s/ Jordan D. Cunningham</u>
                                        Jordan D. Cunningham, Esquire
                                        PA Supreme Court I.D. No. 23144
                                        P.O. Box 60457
                                        Harrisburg, PA  17106-0457
                                        Telephone:  717-238-6570


F:\Home\AHEWITT\DOCS\D-F\DODD, DAVID\PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW\4 PROPOSED FINDINGS OF FACT final 062513.wpd

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) CRIMINAL NOS. 1:CR-10-183 |
| | )            and 1:CR-11-003 |
| v. | )   (Judge Rambo) |
| | ) |
| DAVID RICHARD DODD, II | ) |
| | )   ELECTRONICALLY FILED |

**<u>CERTIFICATE OF SERVICE</u>**

     I do hereby state that on the **25th** day of **June 2012**, I served a true and correct copy of the foregoing  in the above captioned matter, by electronic mail or by placing the same in the United States mail, first-class, postage prepaid, in Harrisburg, Pennsylvania, as follows:

William A. Behe
Assistant U.S. Attorney
228 Walnut Street
P.O. Box  11754
Harrisburg, PA  17108
Email:  <u>william.behe@usdoj.gov</u>

<u>     /s/ Angela L. Hewitt          </u>
Angela L. Hewitt
Legal Assistant

86